PEARSON, et al. *v.* DIXIE ELECTRIC POWER ASSN., et al.

Feb. 1, 1954

No. 39052 51 Adv. S. 67 70 So. 2d 6

*Paul G. Swartzfager* and *Raymond Swartzfager,* Laurel, for appellants.

*Beard, Pack & Ratcliff,* Laurel, for appellees.

McGehee, C. J.

This suit involves a claim under the Workmen's Compensation Act of 1948 and amendments thereto. The

claim is for death benefits and is on behalf of the widow and four dependent minor children of William "Bill" Pearson, deceased, who came to his death while employed by the appellee, Dixie Electric Power Association, in Wayne County on an occasion when he was assisting a crew of other employees in cutting and clearing off a thick growth of shrubs and bushes from the right-of-way of the electric power line on August 23, 1951. The attorney-referee, after a full hearing of the testimony of several lay witnesses and two physicians, reached the conclusion on the circumstantial evidence that the death of said employee arose out of and in the course of his employment and allowed the claim as being compensable under the provisions of said Act.

On appeal by the employer and its insurance carrier, the American Motorists Insurance Company, to the full Workmen's Compensation Commission, two of the members thereof voted to reverse the decision of the attorney-referee and disallow the claim. The other Commissioner entertained the contrary view and voted to allow the claim. On appeal to the circuit court the decision of the majority of the Commission was affirmed and the claimants have prosecuted this appeal.

On the question of whether the death of the employee arose out of and in the course of his employment there was developed an issue of fact before the attorney-referee as to whether or not the employee had been suffering from a heart ailment prior to the date of his death and died while on the job solely because thereof without regard to the work in which he was engaged, or whether the exertion of his work had aggravated, accelerated or in any manner contributed to his death.

The widow of the deceased testified that "he felt that he had gotten too hot the day before" while at work. She evidently had reference to what happened to him two days prior to his death, since on account thereof he did not work the day before. She denied that her husband had ever suffered from heart trouble to her knowledge

during the 21 years of their married life, but she admitted that he was rejected for military service in World War II and testified that she did not know the cause of his rejection; that he was 44 years of age and had worked practically every day for the appellee, Dixie Electric Power Association, for a period of about one year immediately prior to his death and had been engaged in the same kind of work that he was doing on the occasion of his death.

It appears from the undisputed evidence that when the employees gathered for the 30-minute lunch period on August 21, 1951, the said employee complained to his foreman that he had "a burning hurt" in his chest; that the foreman advised him to go and get in the nearby truck and rest a while after lunch instead of going back to work; that he complied with the suggestion of the foreman but decided later in the afternoon to try to resume his work; that then after working about 15 minutes he felt the burning or hurting in his chest again and went back to the truck where he remained a short while and then decided to go home; that he consulted a physician, Dr. Lovette Golden, of Laurel, who examined him but failed to detect any heart ailment; and that this physician advised him, according to the statement made by the employee to his wife and to his foreman, that if he would take a dose of milk of magnesia he would be able to resume work the next morning.

At any rate, the employee rested at home on August 22nd, and during his absence from work he suffered no further pain or discomfort, so far as the evidence discloses. He returned to join the right-of-way crew on the morning of August 23rd, worked until noon, was off for a 30-minute lunch period, worked a very short while after lunch to help complete the task at that particular place on the right-of-way, and then rode in a truck about 5 miles to the location where he died. He had been working there a short while, cutting bushes not larger than 2 or 3 inches in diameter and other growth with a grass blade or scythe, when at about 2:30 P.M. he was seen to walk

away from where he was doing the cutting, but no one observed him long enough to see where he stopped on the right-of-way. His working implement was found a few steps from where he had quit work, and his body was found about the same distance down the right-of-way from the implement, about 15 minutes after he was last seen at work.

Immediately prior to returning to work after lunch on August 23rd, the employee was evidently feeling no discomfort, since he was then laughing and talking in connection with a practical joke which he had just played on a fellow employee. When his body was found several steps from where he had been at work on the right-of-way, he was lying on the ground in the shade with his head resting on his left arm. No autopsy was made and no physician examined the body, but the coroner empanelled an inquest jury, which assembled at the scene, and it was found that the body was badly discolored and there were no marks of violence on the body or any signs of a struggle at the place where it was found. It could reasonably have been inferred that something occurred to render it necessary for him to cease work and go lie down in the shade where he died within a few minutes after quitting work. The verdict of the coroner's jury was to the effect that the employee's death was "from natural causes, apparently heart attack," and the coroner testified that the words "apparently heart attack" were noted thereon to indicate what the natural cause was thought to be, as a non-expert opinion.

In addition to the testimony of the employee's widow and that of the coroner, the claimants introduced at the first hearing which occurred before the attorney-referee on January 25, 1952, the testimony of a fellow employee to the effect that about 15 minutes prior to when the employee Pearson was last seen at work he was laughing and talking; that the weather was "plenty hot"; and that said employee had told the witness on a prior occasion that he had been examined by army doctors who

found that his heart was in bad shape, and he had made that statement frequently to other members of the crew. The claimants then rested their case, except for medical testimony which was given at a later date before the attorney-referee, and the substance of which will be hereinafter stated.

Thereupon the employer and its insurance carrier called as their first witness Arnold Pearson, a brother of the deceased employee and who was a former member of the board of supervisors. He testified in substance that the deceased had had a bad heart condition all of his life, and had told him that the army doctors had rejected him for military service on that account; that he personally knew from reputation in the family that the deceased employee had previously suffered from "a leaking heart" and that it was a permanent heart condition; and that their father wouldn't let him work because he "was not able to do a lot."

The foreman of the right-of-way crew was then introduced by the defense and he testified in conformity to what has been heretofore stated in regard to what occurred at the lunch period and in the afternoon of August 21st, and that the employee had been working only about 15 or 20 minutes on the afternoon of August 23rd immediately before he died. This witness testified that the weather was typical weather for the time of year in that locality, and he also corroborated the coroner as to the location and condition of the body, and confirmed the fact that the employee had previously mentioned his heart ailment.

The defense also introduced G. L. Rogers, a member of the right-of-way crew who corroborated the other testimony in regard to the employee's statements about the pre-existing heart ailment and who told of the incident when the deceased immediately before returning to work from lunch on August 23, 1951, had "wadded up an old fan belt and threw it" under the feet of the witness, startled him by exclaiming "Snake!", and then

laughed about the occurrence. He also corroborated the testimony of the coroner as to the condition of the deceased and the position in which his body was lying when found on the right-of-way.

Curt Robinson, another member of the right-of-way crew, confirmed on behalf of the defense the alleged fact of the previous statements of the employee in regard to the army doctors having rejected him on account of a bad heart condition and also as to what occurred at the lunch period and during the afternoon of August 21st. This non-expert witness did not think that the employee came to his death from being overheated or overworked, and he emphasized that he was talking and laughing immediately before going back to work shortly before his death.

Thereupon the defense tendered 3 other members of the right-of-way crew for cross examination by the attorney-referee or by the attorneys for the claimants, upon the assumption that their testimony would be cumulative and corroborative of the testimony of the other members of the crew.

The cross examination of those 3 witnesses was waived and the hearing was adjourned to a later date when the attorney-referee on February 8, 1952, heard the testimony of two physicians who, in answer to hypothetical questions based on the testimony given at the former hearing, expressed the opinion that the deceased employee's death was due to coronary thrombosis or coronary occlusion. He testified that a person who had a leaking heart would not have died suddenly because thereof, assuming that he had been able to perform the work in which this employee was engaged up to the hour of his death.

Upon the assumption that the deceased employee had no previous heart trouble as testified to by the widow, the first medical witness stated that "I would say he died from heat exhaustion"; that "if I positively knew he had a bad heart and undergoing exertion, I would

say it added to the cause of his death." The attorney-referee stated during the testimony of this witness that: "The testimony shows it was manual labor. But this was not unusually hard for this type of work. * * * I would like to get the doctor's reaction. A. If he had this and was undergoing extra strenuous work it would certainly not be good for him. I would not think it would, and I would have advised him not to have done it if I knew his heart was in this condition. It is possible that it helped to cause his death by simply putting an extra strain on him. Q. Would it be more logical to assume, doctor, under the conditions outlined that the man died from over-exertion with an existing heart condition, or that he just layed down and died a natural death? A. I would rather feel that he died from the heart condition and this other imposed upon his heart, too."

The second medical witness testified in response to the hypothesis based in substance upon the testimony given at the former hearing by the lay witnesses that "My impression would be that (if) the man dropped dead under those circumstances, it would have something to do with the heat * * *. I would think the exertion would play an important part in that." This last statement was made upon the assumption that the employee had a slight heart disorder and was working on a hot August afternoon immediately before his death. The witness further stated, "If I know a fellow has heart trouble I tell him not to work and to get plenty of rest. Q. If a person has an existing heart trouble in any degree and is subjected to strenuous work, manual labor, under the heat conditions we outlined it is logical to assume the over-exertion and heat would accelerate his heart condition and bring on his death? A. Yes, sir." On the hypothesis disclosed by the lay witnesses at the former hearing this physician said: "Something precipitated that (his death). He could have had an occlusion this first day, but his death three days later

something must have precipitated that. Work, exertion, strain or anything could have precipitated his death. * * *" With reference to the heat this witness testified that "* * * in this type of climate, around August, I saw several fellows in Ellisville fall out, saw some I thought was going to die." Neither did he think that there was any relationship between leakage of the heart and coronary occlusion. On cross examination by counsel for the claimants, and in answer to a hypothetical question based on the correct premise, except that the question assumed that the employee was doing his work on a steep slope, the witness answered: "I would say the work and the heat would be a precipitating factor." Thereupon the attorney-referee asked him: "Doctor, I want to ask you this question. Of course, you understand that clearing right-of-way, swinging a grass blade, that in itself requires considerable physical strength and it is manual labor. Supposing this man was working steady for about twenty or thirty minutes, or say fifteen or twenty minutes, put it that way, under the circumstances they described to you, would you think that could have or might have contributed to his death or contributed to the heart occlusion, if that is what he died from?

The work?

Yes.

Yes, sir, that would have to be a contributing factor. And then, as you remember, last August was mighty hot weather?

Yes, sir, it was.

I don't know about this particular day. What effect, if any, would the weather have to do with it, in your judgment?

The heat would be a factor."

The proof is ample, therefore, to show that it was either "plenty hot", "unseasonably" hot, or average August weather in that locality. And we are of the opinion that it is inescapable that if it was not really

hot weather this employee would not have quit work within 15 or 20 minutes after resuming the same following his 30-minute lunch period and have sought a shady ·place where he either fell or laid down and soon died. The only other conclusion would be that he had a sudden change while cutting the bushes a few minutes before his death and that this change from feeling well and laughing and talking to one of sufficient pain and discomfort as to cause him to leave his place of work, drop his grass blade on the way and seek refuge in a shady place, was either due to the strain of his work or becoming over-heated on account of both his work and the hot weather.

We are not unmindful of the argument on behalf of the defendants that it was incumbent upon the attorney-referee to base his conclusion on proof as to whether or not the work in which the employee was engaged had in any manner aggravated, accelerated or contributed to his death. However, the proof required is not confined to direct testimony. A fact may be established by the clear preponderance of the testimony in connection with all the surrounding conditions and circumstances even though the proof is purely circumstantial.

It is true that in the case of Cowart, Guardian v. Pearl River Tung Co., et al., 67 So. 2d 356, (not yet reported in the State Reports) there was expert testimony on the part of the physician at the hospital and also other medical testimony as to what ailment the employee died from, and which clearly showed that the exertion of the employee while actually at work under her employment then and there brought about the rupture of a blood vessel on the brain. In the particulars stated that case is clearly distinguishable from the case at bar, but it is nevertheless controlling in two other material aspects in the case now before us. There, as in the instant case, the employee was performing the labor in the usual and customary manner and without unusual exertion beyond the amount employed for several months prior to the

fatal illness and death; and there, as contended for by the claimants in the instant case the exertion and working conditions aggravated, accelerated or contributed to the death of the employee. In other words, the Cowart case was authority for the propositions first, that the exertion on the particular occasion need not be greater than had been customary and apparently unharmful and, second, that the work of the employee needs only to be a contributing, not the sole, cause of an injury or death of an employee in order for the injury to arise[j] out of and in the scope of the employment.

In 58 Am. Jur. 255, it is said: ''By the weight of authority, the sudden and unexpected breakdown of some portion of the internal structure of the body, * * * or the failure of some essential function thereof, as in the case of heart failure, * * * brought about by the exertion of the employee while engaged in the performance of his duties, or by the conditions of the employment, even without any external happening of an accidental nature, is to be regarded as an accidental injury within the meaning of the terms 'injury by accident', 'injury proximately caused by accident', 'personal injury accidentally sustained', and similar expressions, as used in compensation statutes, as well as simple personal injury, although there are holdings to the contrary. And this is true notwithstanding the workman may have been suffering from a pre-existing infirmity which constituted a pre-disposing cause of such disablement. It is said in this connection, that an internal injury which is sudden, unusual, and unexpected is none the less accidental because its external cause is part of the victims' ordinary work.''

In the case of McGregor and Pickett v. Arrington, 175 S. W. 2d 210, the Supreme Court of Arkansas said: ''In our opinion the evidence shows that the decedent, while performing his duties as an employee of respondent employer, put forth an effort that was greater than his heart, already weakened by disease and no doubt fatigued

by long hours of labor, could bear. Thus, the decedent suffered an exertion, the accidental and unexpected result of which was an injury to his heart, causing death. We, therefore, hold that decedent's death resulted from an accidental injury arising out of and in the course of employment.''

It would unduly prolong this opinion to review the numerous decisions of the various state courts which support the views hereinbefore quoted. The issue in the instant case gives rise to the inquiry as to whether or not the fact that an employee could have died with a cerebrovascular stroke, that is to say a rupture of a blood vessel on the brain, as in the Cowart case, even while sitting in a rocking chair instead of being at work, or with coronary thrombosis or coronary occlusion, as in the instant case, even though the employee could have sustained such an attack and come to his death while resting in bed, would preclude a recovery by the claimants of the death benefits in the case now before us if the decision of the attorney-referee in finding that the work in which the employee Pearson was engaged was a contributing factor in causing the recurrence of the ''burning hurt'' in his chest of two days before, and that this was a contributing cause of his death is amply sustained by proof.

■■■ We are of the opinion that the attorney-referee was supported by the great weight of the evidence in holding that it had been proved circumstantially that the death of this employee arose out of and in the course of his employment, and that it was error on the part of the Workmen's Compensation Commission to reverse his finding in that behalf. The Commission itself expressly found (1) ''that the work he, the deceased, was doing was manual labor and required considerable physical exercise''; and second, ''that the deceased was required to do substantially the same labor as was required of his fellow employees and that he was not required to do any

labor over and above that normally expected of his employment.'' Having reached the first conclusion, then under the testimony of the expert witnesses it followed that considerable physical exercise under the facts assumed in the hypothetical questions would probably have been a contributing factor in causing his death on the occasion complained of. The second finding above mentioned is not at variance with what was true in the Cowart case where we held the claim compensable.

Moreover, ''where an employee is found dead at his post of labor without direct evidence as to the manner of his death an inference may arise of an accident springing out of and in the course of his employment; and when such prima facie case is thus made out, the burden shifts to the employer to produce evidence to overthrow such a prima facie case.'' In the instant case, the defendants did not introduce any medical testimony to contradict what had been testified to by the physicians on behalf of the claimants. The Cowart case was decided by us since the hearings were conducted in the instant case, and the same rule as to death from a cerebrovascular injury, involved in the Cowart case, is equally applicable to death from coronary thrombosis or coronary occlusion where the trier of the facts is supported by the great weight of the evidence that the work in connection with the hot weather that prevailed while the employee Pearson was cutting thick underbrush with a grass blade or scythe in a creek bottom at or near the foot of the steep incline testified about would in any manner aggravate, accelerate or contribute to his death.

The presumption that, where an employee charged with the performance of a duty is found injured or dead at a place where it would be necessary for him to be in performing the duty, the employee was injured or died under circumstances indicating an accident arising out of and in the course of his employment, as being due to a sudden or unexpected breakdown of some portion of

the internal structure of the body, or from heat exhaustion, is supported by the cases of Fisher v. City of Decatur, et al., 1935, 99 Ind. Appellate 667, 670, 192 N. E. 844; Progress Laundry Co., et al. v. Cook, et al., 1935, 101 Ind. Appellate 235, 198 N. E. 807; Hunt, et al. v. Gaseteria, Inc., 1938, 105 Ind. Appellate 197, 201, 12 N. E. 2d 992; National-Helfrich Potteries Co. v. Collar, 1939, 107 Ind. Appellate 225, 23 N. E. 2d 620; Milstead, et al. v. Kaylor, et al., 212 S. W. 2d 610; and Home Ice Co. v. Franzini, 161 Tenn. 395, 32 S. W. 2d 1032, 1033; and this presumption was recognized by our own Court to exist in the case of Majure v. Alsup & Associates, 216 Miss. 607, 63 So. 2d 113, even though it was held inapplicable in that case on the ground that it did not appear that the deceased was found dead at a place where his work was to be done, there or thereabouts.

 After a careful consideration of all the facts, the decisions cited in the briefs of counsel and other legal precedents, all of the eight Judges who have participated in the consideration and decision of this appeal are of the opinion that the circuit court was in error in affirming the decision of the majority of the Commission wherein it reversed the decision of the attorney-referee and disallowed the claim here involved. The cause must, therefore, be reversed and judgment here for appellants on liability and remanded in order that the death benefits may be fixed and awarded to the complainants in accordance with the provisions of the Workmen's Compensation Act.

Reversed and judgment here for appellants on liability, and the cause remanded.

All Justices concur except *Gillespie, J.,* who took no part.