W. G. AVERY BODY Co., et al. *v.* HALL.

No. 39540        April 18, 1955        79 So. 2d 453

*Young & Daniel,* Jackson, for appellant.

55

*Travis & Moore,* Jackson, for appellee.

ETHRIDGE, J.

On May 7, 1953, appellee J. C. Hall was an employee of appellant W. G. Avery Body Company. He had been working for appellant for about three years as a general handy man about the plant, and as a helper on a saw. For some time he had been suffering from a hypertensive cardiovascular disease with resultant high blood pressure, and the usual symptoms accompanying that disease, such as headaches and dizziness. While working that morning he suffered a hypertensive encephalopathy or "black-out" attack resulting in severe damage to his vascular and cardiac system.

The sole question is whether his employment aggravated, accelerated or combined with his preexisting disease or infirmity to produce the disability. The attorney-referee's award of compensation was reversed by the commission. The circuit court reversed the commission and held for the claimant.

I.

Hall is forty-nine years of age, six feet three inches tall, and weighs about two hundred forty-three pounds. About three years before his injury on May 7, 1953, appellant Avery employed him as a sawman, but he testified: "I wasn't performing the duties. I couldn't cut

the lumber to suit the man. He took me off and had me tail the saw and putting the lumber on the flats.'' After Hall was removed from the job as a sawman, he was assigned to work as a common laborer about the plant, except that he would work as a sawman when one of the regular men was ill or not present. For some time prior to May 7, his duties had consisted principally of ''tailing'' a cut-off saw, unloading cars, and working as a relief sawman. The work was done at a table about thirty feet long. The cut-off saw was situated at the center of the table, and the sawman would pull it forward and backward on roller bearings to cut the pieces of wood, which were 1½'' thick, 2½'' wide, and about 14' long, into lengths of 30'' to 40''. To the left of the sawyer was a man who would place the pieces of wood to be cut on the table, upon which was a series of rollers. The sawyer would place the wood in position, and pull the saw forward to cut, and then push it back. A coworker to the right of the sawyer would then remove the sawed piece of wood from the right side of the roller table and place it on a stack. Most of appellee's work at the table before May 7 was in the latter operation, called ''tailing'' the saw.

Hall testified that about once or twice a week he would work as a sawman if the sawyer was off duty. On May 6 and 7 Hall was working as a relief sawyer. Light was supplied for the table by a drop-cord light fixture suspended from the ceiling, seven feet eight inches from the floor, and directly over the position of the sawman operating the saw. The light was supplied by a 200-watt bulb, with a metal shade twenty inches in diameter, and a three inch lip on the underside of it. Hall testified that on the morning of May 7 he started working at 7 o'clock as a relief sawman, directly under the light bulb, which was seventeen inches above his head. He worked from 7 A. M. until 8:50 A. M. without stopping, and at the latter time he suffered the hypertensive attack. He stated that after he cut the wood, he threw the short

ends in a box over his head. He said, "After then, I went to look up and I fell, and I didn't know nothing. That light was just so hot over my head. It was a shaded light over my head." He testified that the light throws off heat, "because we warmed our hands by that light in the winter time . . . and in the summer time, it would be so hot under there, you be sweating." Hall said that his foreman told him that morning to rush up the job on cutting the ash, because there was a carload of maple to be cut. He said that all he remembered before the attack was, "My head was getting hot and I looked at that light and the next thing I know, I was in St. Dominics Hospital."

Claimant called as a witness T. L. Sanders, foreman of the mill. Sanders said that Hall was working as an extra man or common laborer anywhere in the place he needed him, but he was not the regular sawman. He did not remember telling Hall to rush up his work that morning. Griffin and Williams were working at the table with Hall. The sawman's job was about the lightest work Hall did around the plant. Sanders admitted that the reflection from the light would be directly on the sawman, who stands immediately under it. He did not know whether any heat would be radiated from it.

William L. Waller, an attorney, testified as to an experimental test he made with two thermometers under a 200 watt light bulb with a metal shade, somewhat similar to the one under which appellee was working. There was no showing of substantial similarity of conditions between the Waller test and the situation in question, but the attorney-referee admitted the evidence for whatever probative value it might have concerning the difference, if any, between the heat under a somewhat similar lamp and not under it. The witness testified that he used two thermometers, placing one eighteen inches beneath the light bulb upon a table, and placing the other across the room. The room temperature was eighty-three degrees. He testified that although the thermometer away from

the light bulb remained eighty-three degrees, the thermometer under the light bulb within a period of fifteen minutes had increased nineteen degrees in temperature, and was still increasing.

Noble Griffin was working at the saw table with appellee when he was injured. He testified that appellee had pushed him a piece of wood and he pushed it back to him, and when appellee did not touch it, ''I looked and he was looking straight up at the light,'' and he then fell. He stated that appellee ''wasn't doing no sweating to amount to nothing.'' Appellee did not fall against any object, other than the floor. He did not hear Sanders say anything about rushing the job.

Dr. W. H. Rosenblatt, a cardiovascular specialist, testified that appellee had arterio-hypertension and hypertensive cardiovascular disease. When the body is exposed to heat, there is a reflex dilatation of the blood vessels in order to offset that heat, and a drop in blood pressure, which, by reflex, results in an increase in restriction and rise in blood pressure. This produces a hypertensive crisis, known as encephalopathy. Dr. Rosenblatt was of the opinion that appellee's employment, and the conditions under which he was working, particularly the exposure to heat and exertion aggravated and contributed to his attack; and that he now has advanced myocardial damage, with a minimum disability of 50 percent. Although he stated that this same thing could happen to a person with appellee's disease under other circumstances, it was his opinion that his employment conditions aggravated and contributed to the disease. He attached primary significance to the heat under which appellee was working. When any part of the body, such as the head, is exposed to heat, it will cause dilatation of the blood vessels. However, if the heat applied to appellee's body was less than normal body temperature of 98.6 degrees, it was his opinion that the heat would have no relationship to the injury. But Dr. Rosenblatt further said that where heat is applied to a particular

part of the body, there would be dilatation of the blood vessels.

Appellants offered five witnesses. George Fish, meterologist for the U. S. Weather Bureau, testified that on May 7, 1953, at 8:30 A. M. the temperature in Jackson was sixty-seven degrees, and at 9:30 A. M. it was seventy degrees.

Israel Armand, an employee of appellant, who has worked at the same cut-off saw and under the same light for twelve years, testified by stipulation that he has never noticed any ''appreciable heat at or near the light,'' has never felt any ill effects from it, and that neither the light nor the heat had ever bothered him. Armand was the regular operator of this saw, and Hall substituted for him from time to time.

Murray Regan, an electrical engineer, testified concerning certain experimental heat tests he made under the identical light on August 1, 1953. The substance of his testimony was that on that day, which was considerably hotter than May 7, 1953, at a point three inches above claimant's head, the temperature was not more than ninety-five degrees. August 1 was fifteen degrees hotter than May 7, and applying this temperature differential and relating it back to May 7, Regan said that on May 7 the temperature at a point three inches above claimant's head was eighty degrees. The thermometers used in these tests were placed upon adjustable level rods.

Dr. W. M. Dilworth, a specialist in internal medicine, testified that he first had occasion to see appellee on May 8, 1953, the day after his attack; and that appellee had hypertensive cardiovascular disease and had suffered an attack known as hypertensive encephalopathy, being complications of the former disease referable to brain damage. Appellee's tests for syphilis were positive, but he was not able to say the extent to which this disease might have contributed to the attack. With reference to the degree of heat necessary to precipitate a hypertensive attack, Dr. Dilworth was of the opinion that a per-

son would have to be subjected to extremely high temperature. He did not think that the conditions of appellee's work had any "bearing on his crisis," or that the heat from a 200 watt bulb could aggravate or contribute to such an attack. Appellee could have had the attack anywhere, on the bus or while eating breakfast, and it was purely coincidental that it happened where it did, in his opinion. X-rays which were made of appellee revealed also that from his fall he had suffered fractures of two vertebrae.

However, Dr. Dilworth said that where he has a patient with a hypertensive condition similar to that of appellee, he would not encourage that patient to exercise or exert himself on activities which he had not been doing, but "it might be possible to let them go back to the same work." He would curtail the patient's activities, and if he did not respond to drugs, it might be necessary to put a patient of that type to complete bed rest. In response to the question of whether a man's work or activity immediately preceding an attack has anything to do with aggravating or precipitating his condition, Dr. Dilworth said: "Yes, sir, I think it does. If he does something more strenuous than what he ordinarily does."

Dr. T. E. Wilson, a cardiovascular specialist, testified on the basis of a hypothetical question containing appellee's medical history, that he did not believe that there was any causal connection between his employment and his attack. Prior to that attack, appellee had a widespread cardiovascular disease, which would include disease of the arteries of the brain. Syphilis will increase the severity of the hypertensive disease. In order for heat over the head or other part of the body to be the cause of a hypertensive "black out," it would have to be above body temperature and up to 102 to 105 degrees. He was of the opinion that appellee's attack could have occurred anywhere. But he said that strain, which includes physical, mental and emotional strain, is bad on the heart of a person with hypertensive disease.

Dr. Wilson stated that he would curtail the laboring activities of a person with appellee's disease. He further testified: Q. "So that would put us back again on the question of aggravation or precipitation we were on awhile ago." A. "Yes." Q. "In other words, if he's doing the usual work, anything he might do might cause it?" A. "Yes." Assuming appellee was a general laborer and handy man about the plant and that he did not do this work regularly but only on infrequent occasions, he stated that this would change his first conclusion of no causal relationship; and that appellee would be under a nervous tension and the strain of doing the work and keeping it going. He was of the opinion that, if appellee was doing a job which he did not usually do, he would more likely have had the attack then than on his usual job. He was of the opinion that the "black out" was a cerebral rather than a cardiovascular accident. In his opinion heat applied to a man's head above normal body temperature would aggravate his condition, and this could occur with two or three degrees above body temperature. A normal man could adjust to that, but one with a diseased heart would be taking a chance. Assuming the blood vessels were not normal, any form of strain would aggravate or help bring on the attack. Extremities of work or of rest precipitate such attacks. He would have advised appellee to curtail his work, and by not curtailing it, he possibly aggravated his condition. Appellee had abnormal strain from his high blood pressure.

The attorney-referee found that appellee's injuries arose out of and in the course of his employment. A majority of the commission reversed the attorney-referee and denied compensation. The commission held that the overwhelming weight of the credible evidence showed that the highest temperature to which claimant's body was exposed was considerably less than body temperature, and that claimant failed to show that any excessive heat contributed to the injury; that the heat to which

claimant's body was exposed was less than the required minimum to aggravate or precipitate the attack; that the experimental test made by Waller has no probative value, but that Regan's test was entitled to be relied upon.

The circuit court reversed the commission and granted an award. The circuit judge observed that there was a factual dispute about whether heat from the light precipitated appellee's collapse. It was the circuit judge's idea that there are certain facts within common knowledge upon which the court may act, and that a person in appellee's state of health could not do the work which he was doing with safety; that the emphasis upon the heat over claimant's head was misplaced; and that the employment was a precipitating factory in the injury.

## II.

■■ ■ We think that the overwhelming weight of the evidence requires a finding that appellee's employment aggravated, accelerated or combined with his preexisting disease or infirmity to produce the disability and injury to his cardiovascular system resulting from the hypertensive attack. ■■■ This Court in numerous cases has established the principle that a preexisting disease or infirmity of an employee does not disqualify a claim if the employment aggravated, accelerated or combined with the disease or infirmity to produce the death or disability for which compensation is sought. Ingalls Shipbuilding Corporation v. Byrd, 60 So. 2d 645 (Miss. 1952); Ladew v. Laborde, 63 So. 2d 56 (Miss. 1953); 1 Larson, Workmen's Compensation Law (1952), Section 12.20. The work must be only a contributing and not the sole cause of the injury. Pearson v. Dixie Electric Power Assn., 70 So. 2d 6 (Miss. 1954). ■■ ■ Another established rule, of particular importance here, is that it is not necessary to show that the exertion which concurred in precipitating the harm was in itself unusual or beyond the routine of the employment. Provided the causal relation is shown, the exertion may be the usual

and customary, and still satisfy the requirements that the injury be accidental and arise out of the employment. Cowart v. Pearl River Tung Co., 67 So. 2d 356 (Miss. 1953); Pearson v. Dixie Electric Power Assn., supra; 1 Larson, Workmen's Compensation Law, Sections 12.20, 38.30.

In the light of these principles, Hall's employment aggravated, accelerated or combined with his preexisting disease to produce the disability. Too much emphasis is placed by both sides upon the issue of whether or not the heat from the light over the claimant's head was a precipitating factor in his attack. The experimental evidence by both Waller and Regan is not of any substantial value on this point. The Waller test failed to show any appreciable similarity of conditions, and the Regan test seems to have been based solely upon air temperature, as distinguished from temperature upon a solid surface such as a man's head directly under and seventeen inches from the light. The Waller test is at least corroborative of a fact of common knowledge, that a 200 watt bulb surrounded by a metal shade will radiate heat upon a solid surface, such as a man's head, over a period of an hour and fifty minutes, which in quantum will at least add several degrees of temperature to the subject's head.

Moreover, as to whether at the time of the injury there was any substantial additional heat reflected upon appellee's head by the light bulb and metal shade, appellee said that the light over his head was so hot that in the wintertime they warmed their hands by it, and that in summer one under it would sweat; and that immediately before he "blacked out" his "head was getting hot" and he "looked at the light." It is a matter of common knowledge that heat from a large light bulb surrounded by a metal shade will radiate heat upon a solid surface nearby.

However, the overemphasis in the trial upon the temperature factor does not negative other important facts

appearing in the record which bring appellee's claim within the above stated tests. The aggravation or precipitation factor of the employment, and its combining with the preexisting disease, may be by an exertion on the job which is usual and customary. Appellee had been working for an hour and fifty minutes continuously without a break on this job, with his existing, extreme, cardiovascular disease. All three of the doctors who testified said in substance that any appreciable exertion would tend to aggravate or precipitate a hypertensive attack. We think that work of this type for this period is certainly a substantial exertion. Moreover, the work which appellee was doing was not his usual and customary job. He testified that he was not well qualified to do the work of a sawman, and that shortly after beginning work several years before as a sawman, he was taken off that job and used only as a substitute, becuse of his inability to do it efficiently. Dr. Wilson, appellants' witness, said that if appellee was performing a job which he did not ordinarily do, the employment would probably aggravate or precipitate his hypertensive disease into an attack.

Furthermore, both of appellants' witnesses, Drs. Dilworth and Wilson, testified that they would have curtailed appellee's activities if he had been their patient, and that a person with the hypertensive cardiovascular disease which appellee had should not participate in strenuous physical activities. Here Hall was performing the job of a sawman, which was not his usual occupation and for which he had been found not to be suitable. Although both of the doctors who testified for appellants stated as a general conclusion that they did not think appellee's employment contributed to his hypertensive attack, it should be noted that Dr. Dilworth said that if appellee had been under his care, he would have curtailed his activities, and that the work or activity a man is doing immediately preceding an hypertensive attack contributes to aggravating or precipitating his condition, particularly if the action involves more strain than what he ordi-

narily does.  Dr. Wilson said that strain, whether it is mental, emotional or physical, is "bad on the heart," and that a person in appellee's physical condition should curtail his activities.  He said that if a man is doing his usual work, and he has extreme cardiovascular disease, which appellee has, anything he might do could cause an hypertensive attack; that if he were doing a job which he did not usually do, it would be likely to produce a mental and emotional strain; and that two or three degrees of temperature applied to the head would be sufficient to aggravate the condition.

Taking all of the medical evidence together, we think that the commission's finding that the employment was not a contributing factor in causing appellee's hypertensive encephalopathy and the resulting disability is against the overwhelming weight of the evidence.  The facts that appellee had this disease in an extreme form prior to the attack, that he had been working as a sawman for an hour and fifty minutes continuously when he had it, that the light bulb and metal shade were radiating at least some additional heat upon the surface of his head and he became hot, that he was doing work which he was not qualified to do and which he did not usually do, and that all of the doctors seem agreed that any form of exertion or strain would probably contribute to a hypertensive attack under these circumstances, demonstrates that the employment aggravated, accelerated or combined with his preexisting disease to produce the disability.  This is the practical and logical conclusion to be drawn from this record.

### III.

A case somewhat similar on its facts is Cowart v. Pearl River Tung Company, 67 So. 2d 356 (Miss. 1953).  Claimant had high blood pressure, and while stooping over picking up tung nuts, she suffered a massive cerebrovascular accident which caused her death.  The commission denied compensation, but this Court reversed that action.

After analyzing the testimony of the physicians, it was concluded that there was not sufficient conflict in the testimony of the two physicians to justify the denial of the claim; that there was insufficient legal evidence to support the denial; and that the great weight of the undisputed, positive evidence warranted the finding that the employment helped to precipitate claimant's death. It was held that the exertion on the particular occasion need not be greater than the usual and customary work, which must only be a contributing cause of the injury. Cf. Federated Mutual Implement and Hardware Insurance Company v. Spencer, 67 So. 2d 878 (Miss. 1953).

Somewhat analogous also is Pearson v. Dixie Electric Power Association, 70 So. 2d 6 (Miss. 1954). The deceased employee had suffered heart trouble for many years and while cutting thick underbrush for the employer with a grass blade, he apparently suffered a heart attack. He was found dead shortly after his collapse. The commission denied compensation. The Court analyzed the testimony of the doctors. It held that the exertion need not be greater than the customary and usual, and the employee's work need only be a contributing, not the sole, cause of the injury. The mere fact that the employee could have died by a stroke while at home or anywhere else would not preclude a recovery by claimant if the work was a contributing factor to the injury and death. It was concluded that the great weight of the evidence showed that "it had been proved circumstantially that the death of this employee arose out of and in the course of his employment." The great weight of the evidence indicated that the death was caused in part at least by the employment. East v. Pigford Brothers Construction Co., 68 So. 2d 294 (Miss. 1953); Tate v. Dr. Pepper Bottling Co., 70 So. 2d 602 (Miss. 1954); Sunnyland Contracting Company v. Davis, 74 So. 2d 858 (Miss. 1954); Railway Express Company, Inc. v. Hollingsworth, 74 So. 2d 754 (Miss. 1954); Reyer v. Pearl River Tung Co., 68 So. 2d 442 (Miss. 1953); International Paper Company v. Hand-

ford, No. 39,579, decided April 4, 1955; Thornbrough Well Servicing Company v. Brown, 78 So. 2d 159 (Miss. 1955); Hartford Accident & Indemnity Company v. Waters, 73 S. E. 2d 70 (Ga. 1952); McMurray's Case, 116 N. E. 2d 847 (Mass. 1954).

For the foregoing reasons, the judgment of the circuit court is affirmed and the case is remanded for further proceedings consistent with this opinion.

Affirmed and remanded.

All justices concur, *Gillespie, J.* with doubts.

### ON MOTION FOR ALLOWANCE OF ATTORNEYS' FEES

May 23, 1955                                    80 So. 2d 53

ETHRIDGE, J.

Appellee and his attorneys have filed a motion for allowance of attorneys fees of 40 percent of all compensation recovered. However, this Court has held that the fee for all services of claimant's attorneys in workmen's compensation cases should not exceed one-third of the sum recovered. Sunnyland Contracting Co., Inc. v. Davis, 75 So. 2d 638 (Miss. 1954); Railway Express Agency v. Hollingsworth, 75 So. 2d 639 (Miss. 1954); Anderson-Tully Company v. Wilson, 76 So. 2d 515 (Miss. 1954). Hence the motion for attorneys' fees is sustained in part, and a total fee of 33 1/3 percent is allowed attorneys for appellee as full compensation for all services rendered. This fee shall be computed and paid in the manner set forth in the above cited cases. Appellee has filed a motion for statutory damages and interest, and we do not consider it, since our judgment as entered allows those items.

Motion for attorneys' fees sustained in part.

All justices concur.