218 So.2d 413 (1969)
MISSISSIPPI ASSOCIATION OF INSURANCE AGENTS, INC.
v.
DEPENDENTS of Clant M. SEAY, Deceased.
No. 45056.
Supreme Court of Mississippi.
January 6, 1969.
Rehearings Denied February 17, 1969.
Cox, Dunn & Clark, William H. Cox, Jr., Jackson, for appellant.
Heidelberg, Woodliff & Franks, Sam E. Scott, Jackson, for appellee.
*414 RODGERS, Justice.
This is a workmen's compensation case appealed to this Court from a judgment of the Circuit Court of the First Judicial District of Hinds County, Mississippi, affirming an order allowing the dependents of Clant M. Seay, deceased, compensation for death benefits of $17.50 per week for 450 weeks, or until the sum of $12,500 has been paid.
The Mississippi Association of Insurance Agents, Inc. appealed to the Circuit Court, and the dependents of Clant M. Seay (hereafter called Claimants) cross-appealed that part of the Workmen's Compensation Commission's order wherein the Commission found and determined that the deceased suffered from a preexisting disease which contributed 50% to his death, for which an apportionment was allowed in the weekly benefits.
The Mississippi Association of Insurance Agents, Inc. (hereafter called Appellant) contends that:
(1) The Workmen's Compensation Commission erroneously determined that the claimants were entitled to death benefits because
(a) the award was based upon the erroneous conclusion that the death of *415 Clant M. Seay arose out of and in the course of his employment contrary to law, and
(b) the award was against the overwhelming weight of the evidence; and
(2) The Commission was in error in requiring the payment of $17.50 weekly for a period of 450 weeks, based upon 50% apportionment, because the Commission did not apportion the total benefits of $12,500 as well as the amount payable each week.
The employer, appellant here, contends on appeal that the facts in this case do not show causal connection between Mr. Seay's work and his heart attack, and that the order of the Workmen's Compensation Commission is contrary to any substantial evidence introduced before the attorney referee.
The record shows that Mr. Seay, fifty-three years of age, was employed as secretary-manager of the Mississippi Association of Insurance Agents, and that he died of a heart attack while attending an insurance convention in Chicago, Illinois.
In addition to his regular position of employment, Mr. Seay was, in 1965, secretary to the Southern Agents Conference, such conference consisting of insurance agents from thirteen southern states. The conference met once a year, rotating from state to state. In 1965 it was held in Mississippi. Being secretary to the conference, Seay coordinated the convention which was held in April of that year. He prepared the convention's agenda, made all necessary arrangements with the hotel in which it was held, and generally handled all necessary details. In March, just prior to the Southern Agents convention, Seay appeared to be in an exhausted condition. He looked flushed, occasionally slept at work, perspired heavily, coughed frequently, and often had trouble breathing.
After the Southern Agents convention, Seay's doctor advised him to go to bed or to a hospital. Seay went home to bed and stayed out of his office for two weeks, but he continued to transact the business of his employer by telephone from his home. After this two week period of convalescence, Seay returned to work. He found a heavier work load than usual, because many things had been put off due to the planning and coordinating of the Southern Agents Conference. Nevertheless, Seay continued his work, his main duty at that time being the planning of the convention, in June, of the Mississippi Association of Insurance Agents, to be held on the Mississippi Gulf Coast. At one point between the Southern Agents convention in April and the Mississippi convention in June, Seay worked twenty-six straight days without taking off. He made all the arrangements for the Mississippi convention.
After the convention in June, Mr. Seay remained at work regularly until he left to go to the Chicago convention on July 16. He had no supervisory duties at that convention. However, he did participate in all the meetings, and at the last meeting of the convention, less than twenty-four hours before his death, Mr. Seay participated in a heated debate over an issue at the convention, and he was observed pounding the table in front of him in an effort to make his point. After the convention ended that afternoon, he met his son who had accompanied him to the convention, whereupon the son noticed Mr. Seay's voice to be weaker than usual; he appeared nervous, haggard, and anxious. That night Mr. Seay and his son went to dinner, attended the theater, and returned to the hotel, where Mr. Seay retired for the night. The next morning he was found dead in his bed.
Mr. Seay was a perfectionist, easily upset, high strung and nervous. He was a dedicated employee, taking his job very seriously. He worked late at the office many nights, and did not take a vacation in the four years prior to his death. He planned, in detail, attended and supervised the two conventions within a short time before his death. He dealt with the tedious arrangements in coordinating these conventions. He was under constant physical and *416 emotional strain and was always in a hurry. He was constantly trying to meet "deadline appointments." Were these facts sufficient to establish causal connection with the workman's employment?
The Commission and the Circuit Court Judge were of the opinion that the claim was compensable.
The employer, appellant, relies strongly upon the opinion in Union Producing Company v. Dependents of Simpson, 251 Miss. 183, 168 So.2d 808 (1964), to sustain its argument under the "ordinary wear and tear of life" doctrine. In the Union Producing Company case the employee died of myocardial infarction following a coronary occlusion. He worked as a clerk in an office, and his work required no lifting, stooping or physical work. He had been suffering from high blood pressure and was hypertensive and nervous. He experienced his attack while sitting at his desk working. He remained at his work for about an hour and a half before going to the hospital, where he died very soon after he arrived. In that case the Court pointed out that: "The proof showed without dispute that Employee had no supervisory duties, and he had ample time to do his work, and was not crowded or rushed for time."
The opinion in that case was based largely upon the fact that the employee was not under any physical or mental strain. On the other hand there is substantial evidence, in the case at bar, that the strain of Mr. Seay's employment was greater than the ordinary wear and tear of life to which everyone is subjected.
We affirmed the trial court and the Commissioner's holding that there was no showing of physical or emotional strain in the case of Moore v. Hederman Brothers, 240 Miss. 358, 127 So.2d 647 (1961), which is also a case where an employee died in bed. In Moore, supra, we affirmed the judgment of the trial court and the order of the Workmen's Compensation Commission denying compensation, because there was no showing that the employee was doing extreme physical exertion, nor was he subject to an emotional strain at the time of or just before his death.
We pointed out in the case of Insurance Department of Mississippi v. Dinsmore, 233 Miss. 569, 102 So.2d 691 (1958), suggestion of error overruled, 233 Miss. 581, 104 So.2d 296 (1958), that a disability proximately resulting from mental and emotional exertion may be causative and therefore compensable. On suggestion of error, we held that an injury does not have to develop instantaneously, but may accrue gradually over a period of time not too remote. See also W.G. Avery Body Company v. Hall, 224 Miss. 51, 79 So.2d 453, 80 So.2d 53 (1955).
The medical testimony in this case is in conflict as to whether or not the work activity of Mr. Seay accelerated his heart attack. Drs. Melvin and Ward testified, based on reasonable medical certainty, that the activity of Mr. Seay did accelerate his fatal accident. This testimony clearly shows that without the stress and strain of his work Mr. Seay would not have died when he did.
There is other testimony to the contrary by Drs. Hudson, Van Landingham, Fyke and Rosenblatt. We are, however, of the opinion that the expert testimony of Drs. Melvin and Ward, coupled with factual evidence, was sufficient, substantial evidence on which the trier of the facts could reasonably conclude that the death of Mr. Seay was causally connected with his work and was brought on by his physical and emotional stress in the performance of his duties.
It is pointed out by Dunn, Mississippi Workmen's Compensation section 97 (2d ed. 1967) that:
"Apparently there are two schools of medical thought as to whether or not usual and normal physical exertion has any causal connection with a heart attack. There is, also, an element of emotional strain which is sometimes considered as *417 a factor and the varying degrees of physical effort or strain, with or without the emotional factor, may play a part in producing medical opinion on one theory or the other, as will be noted from the summaries of the proof adduced in the several cases cited throughout this article. In fact, conflict in the medical testimony has followed such a characteristic pattern as to be referred to in one case as being typical.
"The result of the typical conflict in medical opinion is that the issue of causal connection in such cases is said to be one for the medical experts and the Commission as triers of the facts, and where there is a conflict of qualified and substantial medical testimony, the decision of the Commission, for or against an award, is final and must be affirmed on review. This result is repeatedly evidenced by the several decisions cited throughout this article and the rule is now said to be well settled."
See also Southern Engineering & Electric Company v. Chester, 226 Miss. 136, 83 So.2d 811, 84 So.2d 535 (1955).
In passing it must be pointed out that the appellant seriously contends that this Court should adopt the report of a committee of the American Heart Association as the rule in cases of heart failure. This report is in effect that: "Heart failure * * * shall be considered related to physical or emotional exertion only if the heart failure occurs during the actual period of stress clearly unusual for the individual involved."
It is argued that this Court has already adopted the foregoing rule in substance in Union Producing Company v. Dependents of Simpson, 251 Miss. 183, 168 So.2d 808 (1964). We decline to adopt this medical rule as a legal doctrine in this jurisdiction, because we have previously held that an employee's heart attack may be causally connected with his work although his coronary attack occurs after he has completed his daily work and sometimes while he is in bed resting.
Professor Larson has this to say on this subject in his work on Workmen's Compensation Law section 38.83 (1967):
"When the actual heart attack occurs outside of working hours, or otherwise at some distance in time from the exertion to which it is attributed, the burden of proving a connection between the work exertion and the attack and of negating `normal progression of the disease' is in the nature of things heavier. As observed in other connections such as the going and coming rule, there is something about the occurrence of an injury within the time and space boundaries of the employment that gives a substantial head start toward compensability. The occurrence of the attack outside these boundaries increases the importance of expert medical testimony, but there is nothing rare about this type of award; examples are sprinkled throughout the cases cited in this section. * * *"
Mississippi Shipping Co. Inc. v. Henderson, 231 F.2d 457 (5th Cir.1956). See also Mississippi Products, Inc. v. Gordy, 224 Miss. 690, 80 So.2d 793 (1955); Pearson v. Dixie Elec. Power Ass'n, 219 Miss. 884, 70 So.2d 6 (1954); Schilling v. Mississippi State Forestry Comm'n, 226 Miss. 858, 85 So.2d 562 (1956); McBride v. Wetmore & Parman, Inc., 241 Miss. 743, 133 So.2d 261 (1961).
Each case must be tested by the evidence introduced in that particular case under the substantial evidence rule, and this Court cannot lay down a specific rule that will apply to all cases by saying that a heart attack is causally connected with the employee's work only when the attack occurs during an actual period of stress. See Dunn, Mississippi Workmen's Compensation § 92 (2d ed. 1967).
The appellant next contends that the weekly compensation and also the maximum recovery allowable under the Workmen's Compensation Law for death benefits due *418 the workman's dependents under Mississippi Code 1942 Annotated section 6998-13, as amended by the 1966 Supplement, should be reduced by apportionment, because the employee's death is shown to have resulted in part from an infirmity which preexisted his death from heart attack. Miss.Code 1942 Ann. § 6998-04 (Supp. 1966).
This Court has agreed with this contention in Cockrell Banana Company v. Harris, 212 So.2d 581 (Miss. 1968), and although this writer dissented, the Legislature has now confirmed this opinion by House Bill No. 671, General Acts of the Regular Legislative Session 1968, Advance Sheet No. 15, p. 4, amending Mississippi Code 1942 Annotated sections 6998-04 and 6998-13 (Supp. 1966), and therefore, weekly compensation benefits and maximum recovery for death benefits except as to the widow's allowance and funeral expenses shall be apportioned, where there is shown to be a preexisting physical handicap, disease or lesion, which is a material contributing factor in results following injury.
We are constrained to hold, therefore, that the 50% contribution due because of preexisting disease applied by the Commission to the weekly benefits must also be applied to the maximum of $12,500.
The judgment of the Circuit Court and the order of the Commission are hereby affirmed as to the finding of the Commission that the death of Clant M. Seay was compensable, and its application of the 50% apportionment to the $35 weekly benefits, but we hold that the 50% apportionment should have been applied also to the maximum benefit of $12,500 payable under section 6998-13(f), Mississippi Code 1942 Annotated (Supp. 1966).
This case is therefore affirmed as to compensability, but is remanded to the Workmen's Compensation Commission for further proceedings as to apportionment, in compliance with the foregoing opinion.
Affirmed in part, reversed in part, and remanded.
ETHRIDGE, C.J., and JONES, PATTERSON and INZER, JJ., concur.
ROBERTSON, Justice (dissenting).
I am unable to agree with the majority that there is any causal connection between Mr. Seay's work, which he had been performing for 26 years, and his fatal heart attack. In my opinion, this Court has now moved full circle and has by judicial fiat converted what the Legislature called "workmen's compensation insurance" into health insurance.
Section 1, Chapter 354, General Laws of 1948, provides:
"This act shall be known and cited as the `Workmen's Compensation Law,' and shall be administered by the Workmen's Compensation Commission, hereinafter referred to as the commission, cooperating with other state and federal authorities for the prevention of injuries to workers and in event of injury their rehabilitation or restoration to health and vocational opportunity." § 6998-01 Miss. Code 1942 Ann. (1952). (Emphasis added.)
Section 6998-04 further provides:
"Compensation shall be payable for disability or death of an employee from injury arising out of and in the course of employment, * * *" § 6998-04 Miss. Code 1942 Ann. (Supp. 1966). (Emphasis added.)
Section 6998-13 says:
"If the injury causes death, the compensation shall be known as a death benefit * * *." § 6998-13 Miss. Code *419 1942 Ann. (Supp. 1966). (Emphasis added.)
Mr. Seay began his work as secretary and manager of the Mississippi Association of Insurance Agents in 1939. Within three weeks after taking office, he conducted his first school for insurance agents. From 1939 to 1965, a period of 26 years, an integral and important part of his regular and routine duties was arranging for, managing, and supervising conventions of the Mississippi Association of Insurance Agents. Another principal part of his duties was keeping abreast of developments in the field of insurance and answering the questions of member agents beamed his way. Arranging conventions and answering questions about insurance had become old hat and second nature with him.
Astute and able counsel for the claimants, realizing that he had no recent episode, incident, or injury occurring on the job that he could point to, asked each doctor a 14-page hypothetical question. With great skill and finesse, he related decedent's entire life, beginning with his birth and ending with his death. He highlighted and stressed in his hypothetical question the conventions of March and June 1965, and the almost insurmountable obstacles that Mr. Seay supposedly met and conquered in staging these two regular conventions. Answering inquiries about insurance addressed to him by member agents was also emphasized as causing Mr. Seay great emotional stress and strain.
After reading this adroit and carefully prepared history of Mr. Seay's life to his two medical witnesses, Dr. Gayden Ward and Dr. J.P. Melvin, Jr., claimants' counsel then asked them if "the work activities of Mr. X in any way whatsoever accelerated or hastened his fatal cardiac accident." Claimants' two doctors answered: "I think that they did." Four doctors, Dr. William H. Rosenblatt, Dr. F. Earl Fyke, Jr., Dr. Manning Hudson, and Dr. David J. Van Landingham, all cardiologists, testified that there was no causal connection between his work activity and his fatal heart attack.
Beginning in May 1946 and up until the time of Mr. Seay's death in July 1965, Dr. Ward, his family physician, testified that he saw Mr. Seay regularly and that periodically he would be nervous, obese, and an intemperate drinker. Over this 19-year-period he suffered from high blood pressure, a pulse rate at times twice the normal rate, nervous indigestion, and periods of depression.
Dr. Ward testified as to an October 27, 1952, visit:
"The patient reports chronic night use of alcohol, six to eight ounces, nervousness, desires to change his basic habits, had some guilt complex and recrimination about his dependency upon alcohol."
As to an October 15, 1954, visit, Dr. Ward observed:
A. October the 15th, 1954. In my own words `patient has been drinking too much whisky for the past two weeks.'
Q. Do you know how many ounces nightly he was drinking?
A. I know he drank at least a half to a pint each night.
Q. Six to eight ounces. How much is that?
A. Half a pint. He had a rather severe hangover reaction was my impression. Temperature was 99. Heart rate was overactive.
Dr. Ward continued:
Q. What did you tell him every time?
A. I told him he was drinking very much intemperately and impulsively and for a purpose.
Q. Did you suggest he discontinue it or limit it or remain the same?
A. I suggested he discontinue it.

*420 Q. What did you tell him about the weight; decrease it or remain the same or what?
A. Decrease the weight.
Q. I'm still talking about October 15, 1954. State whether or not at that time he appeared nervous, tense and emotionally upset.
A. He appeared almost at the verge of coming to pieces, so to speak. I remember him distinctly. He had a severe hangover reaction, a fast pulse rate, elevated blood pressure, perspiring, nervous, restless, apathetic.

Q. Next date.
A. December the 30th, 1954. Stated he had been drinking intemperately again. Vitamin B-1 was given daily, as before. I don't know whether it was hypodermically or not. He was advised to take same relaxant tranquilizer medicine. (Emphasis added.)
On December 11, 1961, Mr. Seay suffered a fracture of the right tibula and fibula. Dr. Ward was asked about his examination at that time:
Q. What do you have to tell us about his weight on that date?
A. It was considerable. I cannot quote it with accuracy. He was considerably overweight. In fact, his weight had been in the neighborhood of 220 or 225 pounds. That's an estimate.
Q. What about his whisky on that date.
A. He had been drinking before this accident. (Emphasis added.)
His examination of Mr. Seay on February 23, 1963, showed a weight of 220 pounds, blood pressure of 160/80, and a pulse rate of 120, which Dr. Ward characterized as twice the normal pulse rate. On May 30, 1965, Mr. Seay developed a severe cough and fever. Dr. Ward testified as to the results of his examination:
Q. All right. Was there or not any congestion in the lungs?
A. I thought there was. And on this date an x-ray of the chest was taken and showed the lungs to be relatively clear, meaning no pneumonia or primary lung disease. The heart shadow is enlarged.
Q. Now, had you noticed at any previous time an enlarged heart shadow on this man?
A. No. I note in my report that it was appreciably enlarged in comparison to films taken four years prior.
Q. Now what, if anything, did you conclude as a result of those x-rays and the enlarged heart shadow and his symptoms generally?
A. He was showing the progression of arteriosclerosis, hypertension, obesity and some of the intemperate habits.

* * * * * *
Q. Were you sure it was pneumonia and not bronchitis?
A. I wasn't. One of the respiratory infections. With the fever, I am sure he developed some type of pneumonitis, which in my opinion overstretched or overstrained or embarrassed his heart and threw it into acute heart failure. (Emphasis added.)
In speaking of heart failure and factors that affect it, Dr. Ward had this to say:
Q. This matter of heart failure as we now understand the term, is that aggravated by overweight?
A. Overweight, heavy smoking, intemperance are factors that are statistical. A person who is guilty of those factors is usually down the line liable to have heart failure or heart embarrassment.

Q. Would you include in your term of intemperance the excessive drinking *421 that was demonstrated in this case from the beginning of your examinations of Mr. Seay?
A. I very honestly do not feel that alcohol per se is the cause. But if I may be devious, I think intemperance of spirit. I formerly was a heavy smoker. Intemperance to me is not only in alcoholic intemperance, but is intemperance of spirit, compulsive or impulsive people, and they smoke intemperately and drink intemperately or they eat intemperately and as a result of alcohol, as a rule, they begin to get obese, and obesity deposits fat in and around the heart and liver and functioning organs or other organs. (Emphasis added.)
On July 16, 1965, Mr. Seay, accompanied by his 19-year-old son, left Jackson for Chicago, to attend an annual meeting and seminar of state and local board secretaries beginning on July 19. He had no duties other than as a delegate. They drove the first day to Poplar Bluff, Missouri, spent the night there and drove to Chicago on Saturday, July 17. They checked into the hotel where the meeting was to be held, had supper, and went to bed.
On Sunday, July 18, 1965, Mr. Seay and his son, in the late morning, had breakfast, met and fraternized with some insurance people in the hotel coffee shop. Sunday afternoon they went to a doubleheader ball game, and after the game, went back to the hotel, had supper, and went to bed.
The business sessions of the Chicago seminar started on Monday, July 19, at 9:30 a.m., and concluded at 4 p.m., in plenty of time for a cocktail party beginning at 6 p.m. The seminar sessions on July 20 began at 9 a.m. and were scheduled to end at 4 p.m. The session ran over for about an hour because of some important insurance questions being discussed. Mr. Seay took an energetic and enthusiastic part in that session and made a vigorous and heated speech toward the close of the session. The seminar was over at 5 p.m., and Mr. Seay's plans were to stay over an extra day in Chicago so that he might meet an old friend and have dinner with him the next night.
Mr. Seay and his son sat in their hotel room talking and watching the boats on Lake Michigan for about an hour and a half. They then journeyed to a nearby restaurant where Mr. Seay, after his customary drink before dinner, enjoyed a leisurely meal. They then went to the theatre, where during the performance Mr. Seay dozed off for four or five minutes. They returned to their hotel room, and Mr. Seay retired about 11:30 p.m. His son stayed up until about 1:30 a.m. watching television. Sometime after 1:30 a.m., his son heard Mr. Seay cough, so he was still alive and breathing at that time.
The next day, July 21, 1965, his son awoke at about 11 a.m., and found his father dead in bed.
Mr. Seay died at some time between 2 a.m. and 11 a.m., which would have been from 9 to 18 hours after the seminar was over and from 2 1/2 to 11 hours after he had gone to bed.
Dr. Ward was the only doctor testifying who was not a cardiologist. The four cardiologists who testified for the appellant and the one cardiologist testifying for the claimants all subscribed to this statement from the Committee Report of the American Heart Association:
"Heart failure * * * shall be considered related to physical or emotional exertion only if the heart failure occurs during the actual period of stress clearly unusual for the individual involved." (Emphasis added.)
Where is the episode, the incident, the injury on the job that caused or even triggered the fatal heart attack? No witness, medical or lay, points the finger at such an incident.
Dr. Melvin, who had never seen or examined Mr. Seay, based his vague, guarded *422 and qualified answers on the 14-page hypothetical question wherein was chronicled the events of Mr. Seay's 54-year span of life. He stated that he thought Mr. Seay died of an acute coronary occlusion and that his underlying disease was coronary atherosclerosis, sometimes referred to as hardening of the arteries. Dr. Melvin agreed with the statement that atherosclerosis is not something that would cause death overnight, that there is a gradual buildup over the years.
Keeping in mind that the claimants' case must stand or fall on the testimony of their medical expert, Dr. Melvin, how can the following answers of Dr. Melvin be reconciled with any other theory than that of the "wear and tear of life"?
Q. So that you're saying here, a man can get to the stage when just the ordinary wear and tear of life is going to possibly precipitate an attack.
A. Absolutely.
* * * * * *
A. We don't belive that coronary atherosclerosis has any relationship to the job a man does.

Q. Uh-huh.
A. We do believe that the way he does his job, the physical and emotional variations in a man's job, do play a part in two ways: by increasing the demand on his heart for blood and by elevating serum cholesterol through stress, by producing additional stress and more acceleration of atherosclerosis, and by producing an aggravation of the disease, and we think actually increases in the rate of acceleration of atherosclerosis.
* * * * * *
A. * * * A lawyer that performs his job with long hours and cigarettes and improper diet is not going to live as long as a man who performs his work in an easy, relaxed way, all other things being equal.
Q. That same thing would apply to anybody in any other job where they had these problems come up from day to day.
A. That's true. It's not the profession or the job; it's how it's done and under the conditions in which it's done.

Q. So you really get over into the realm of not being able to place everything in its own category without considering the personality involved.
A. You have to.
Q. So that a person who has a tendency to take things seriously and to worry and to become upset and all, he is not as good a candidate for extended life as a man who takes things easy.
A. All other things being equal, yes.
Q. And that gets down to the fundamental nature of the individual.

A. It certainly does. (Emphasis added.)
In my opinion, Union Producing Co. v. Simpson, 251 Miss. 183, 168 So.2d 808 (1964), is on "all fours" with this case and should govern our disposition of it. In that case we reversed the judgment of the circuit court affirming an award of the commission and rendered judgment here for the appellant. That case established for this state the "ordinary wear and tear of life test" in heart cases.
In Simpson, the employee died of a coronary occlusion. His work required no lifting, stooping or physical work, it being solely paper work. Simpson was 49 years old and had had high blood pressure for approximately 8 years. He had hypertension and nervousness, had been overweight; and, like Seay, was a worrier. Simpson experienced his attack or episode while sitting at his desk working on a report. In Simpson, four doctors gave their opinions *423 that although the major factor in the death was underlying atherosclerosis, the work activities probably precipitated or contributed to the coronary occlusion.
Other doctors testified that in their opinion there was no causal connection.
This Court, in Simpson, said:
"In 1 Larson, Workmen's Compensation Law, Sec. 38.83 (1952), it is said:
`There must still be an unexpected result, and there must still be an exertion  some exertion  capable medically of causing the collapse. This can by no means be taken for granted. If heart failure overtakes the employee while he is merely waiting for a bus or an elevator, you simply have no strain at all to provide an accidental result of employment activity. The natural progress of the disease may bring it to its fatal climax during working hours, but if the employee's activity at the time involves no effort, or effort which cannot support medically a causal connection, it can be rightly said that the outcome was neither accidental nor causally related to the employment. It was not accidental simply because it did not happen by chance; it happened by the inexorable march of the disease.'

"The foregoing has been cited with approval in Franks v. Goyer Co., 234 Miss. 833, 108 So.2d 217 (1959); Rushing v. Water Valley Coca-Cola Bottling Co., 232 Miss. 338, 98 So.2d 870 (1957), and Ingalls Shipbuilding Corp. v. Howell, 221 Miss. 824, 74 So.2d 863 (1954).
"Therefore, it appears to us that the basis of Dr. Labecki's opinion of causal connection is not legally sufficient to establish causal connection. To hold otherwise would make every employer an insurer of his employees against heart attacks having their onset while the employee is on the job. * * *" Id. at 193-194, 168 So.2d at 812.
The facts negating causal connection in this case are much stronger even than those in the Simpson case. Simpson at least was seated at his office desk working on a report. Mr. Seay, in Chicago at a convention as a delegate only, had finished his duties at 5:00 p.m., relaxed with his son in the hotel room, enjoyed a drink at a leisurely dinner, relaxed at a theatre where he dozed off to sleep, returned by car to his hotel room where he retired at 11:30 p.m., and had been at complete bed rest and asleep until at least 1:30 a.m. the next morning.
Inasmuch as emotional stress has been mentioned, it must be observed that Mr. Seay's duties as a delegate at the convention terminated at 5:00 p.m. and Mr. Seay had no deadlines or problems confronting him, but to the contrary, was faced merely with a night of relaxation, a dinner the next night with an old friend, then a leisurely drive back to Jackson.
The credible evidence clearly shows that the stress and strain of Mr. Seay's job were no more than the ordinary wear and tear of life. Mr. Seay's entire personality, on and off the job, was one characterized by anxiety, tension, nervousness and worry. These traits were inextricably woven into the very warp and woof of his life. Even his doctors described him as having overall "intemperance of spirit." Seay seemed to do everything to excess, including drinking. When he worked he worked intensely and nervously; when he played he played intemperately and excessively.
The body is built to withstand the ordinary stresses and strains of a person's work and play when done temperately and within reasonable bounds. It is not built to withstand chronic intemperance in work, food, drink, play or spirit. It has been truthfully said that hard work never killed anybody. That is a truism that is especially applicable in Seay's case.
The burden of proving causal connection rested squarely on the shoulders of the claimants. They did not meet this burden. The link in the chain of events of Seay's life connecting his work with his death is *424 still missing, even after considering the skimpy and sketchy testimony of claimants' witnesses in its most favorable light. The fatal gap is still there; it has not been bridged.
The judgment of the circuit court should have been reversed and judgment rendered here for the appellant.
GILLESPIE, P.J., and BRADY and SMITH, JJ., join in this dissent.