INGALLS SHIPBUILDING CORP., et al. *v.* BYRD.

Oct. 27, 1952

No. 38496        5 Adv. S. 13        60 So. 2d 645

*White & White,* for appellants.

*William S. Murphy,* for appellee.

ALEXANDER, J.

This is an appeal from an award of compensation with medical and hospital expenses under our Workmen's Compensation Act. Pending the appeal, the former appellee died and the cause has been revived in the name of the widow and other heirs. The original claimant is herein for convenience referred to as the appellee. The shipbuilding company will be referred to as appellant.

Appellee was employed by appellant as a chipper, which involved chipping off the burrs or irregularities left in the process of welding. For this purpose, he was furnished with an electric chisel which worked automatically with compressed air. The device weighed between twelve and fifteen pounds and required its operator to brace himself against the recoil since a constant forward pressure was necessary to chip away the surplus metal. This procedure resulted in a continuous and heavy vibration. The area in which appellee was required to work was a space of only two by three feet in the inner bottom of a ship. In order to brace himself, he was re-

quired to place his back against a narrow piece of metal designated as a strongback.

Appellee, after a physical examination by appellants' physician was employed and reported for work on April 20, 1952. On the two following days, Saturday and Sunday, he did not work. He resumed work on the 23rd and on the 24th, after working in the manner described, he suffered a sharp pain in his back. At midnight, he quit work and went home, at which time he found that he had lost the sense of feeling in his feet. A numbness extended up nearly to the knee. The following morning, he stated that "My legs went out from under me." On the 25th, he consulted a doctor of his own choice, Dr. Benson, who, after being given a history of appellee's case, told him that "his work was causing it." However, appellee went back to work that evening. The following day was a legal holiday and he remained away, but again consulted Dr. Benson and received some treatment for loss of function. On the 27th, he consulted another doctor and was catheterized and reported for work. His condition was then such as to require that he be assigned to less arduous tasks. On that day, he told appellant's foreman, Ware, that he was paralyzed in his legs and received a written slip from the foreman which authorized his quitting of work and served to authorize the guard at the gate to identify and readmit him later to the yards. This written slip contained only the word ".sick" as explanation for his laying off. He then went to the Jackson County Hospital where he received some treatment. His condition of partial paralysis continued and he went to the George County Hospital at Lucedale, where he remained two days. On the third day, he was carried to Mobile and after X-ray examination, he underwent an operation, performed by Dr. Patton. Further operative procedures were carried out the following day. He returned to the George County Hospital on May 6th and remained there for three or four weeks. He was then removed to his home, where he was confined for ap-

proximately four weeks. A second attack required further confinement in the George County Hospital, where he remained about a month. This chronicle of events, though extended, furnishes a background for the determination of the assignments of error to be considered.

The attorney-referee, after hearing the testimony, found the injury compensable. This finding was affirmed by the Commission, and upon appeal to the circuit court, its finding was affirmed. From this judgment, the appeal is taken.

It is first contended that the injury is not compensable because it is not an accidental injury. The contention is properly phrased since Sec. 2 (2) of Chap. 412 of the Laws of 1950 defines "injury" as accidental injury.

(Hn 1) The Commission is amply warranted in its finding that the injury to appellee was caused by the pressure of his back against the metal bar or strongback. This pressure, augmented by the recoil of the automatic chisel with its constant vibration, bore upon a congenital angiomatous malformation and resulted in a thrombosis. The resultant interference was, according to the attendant physicians, the cause of the paralysis. It was found that the abnormal mass of blood vessels was a dormant condition unknown to the appellee or to the appellant's physician who gave him a physical examination prerequisite to his employment. So that we may proceed at once to examine whether an injury, activating a pre-existing disease or physical abnormality is an accidental injury within the meaning and purpose of the Act, when such combination of causes with a resultant injury occurred while the employee was performing his duties in the customary manner. The distinction sought is that between an unexpected cause and an unexpected result. The latter is here conceded, as well as the fact established by the Commission that the injury arose out of and in the course of the employment.

In determining whether the cause was unexpected, we must turn our attention to the cause itself. The ultimate cause of the disability was established to be a thrombosis resulting in paralysis. This condition was, in turn, the result of the damage to the abnormal and diffused mass of blood vessels near the base of the spinal column designated as an angioma. Pursuing the causal chain, this damage was the result of trauma. Such trauma was caused by the steady and rather severe vibration of the chiseling tool whose vibrations were transmitted to the strongback against which appellee was braced. The cumulative sum of such successive vibrations practically and scientifically add up to a cumulated impact differing from a single blow only in the circumstance that the cumulating impulses are transmitted progressively. When it is realized that an external injury requires both an external object and a physical target, to say that the thrust of the body against a fixed object differs in principle from a moving object cast against a fixed body is to be overwhelmed in an exercise of pure semantics.

It may well have been predicted that cases involving accidents arising out of unusual results from usual means would plague the courts with contradictions. There still appear vestiges of common law concepts which search at once for negligent conduct, and adjudge liability upon the basis of foreseeability. The rationale of our Workmen's Compensation Act disavows negligence as a test of liability but allows compensation ''without regard to fault as to the cause of the injury.'' Sec. 4, Chap. 354, Laws of 1948, as amended by Sec. 3, Chap. 412, Laws of 1950.

It must be conceded that some courts have denied compensation where a preexisting disease is lighted up by incidents of the work being performed. Such authorities are cited by counsel. With them, however, we can not agree. It was here testified that it was the nature and manner of the work which caused the injury

and that the disability was the result of trauma. Let it be supposed that a workman is assigned to a job upon a ladder. His safety depends not alone upon the strength of the rung upon which he stands but also upon the strength of the bones which support his legs. Can it be said that if he be cast down by the weakness of the rung he may recover, whereas if it be by the weakness of his bones or skeletal framework his claim is to be denied? To argue that the employer has no control over or knowledge of the physical strength of the employee, is to enter again into the abandoned field of common law.

Rationalization need not be extended. It is enough that the courts have in numerous cases looked through the form into that substance which is the policy of the Act and awarded compensation where an employee has been injured while in the usual course of his employment when it requires his exposure to the hazard of precipitating a dormant and potential risk of physical weakness into an injury which, but for the particular employment, would not have happened. The record discloses testimony to the effect that appellee would not have suffered injury had he been otherwise employed.

We summarize our views by quoting with approval the following: **(Hn 2)** ''Pre-existing disease or infirmity of the employee does not disqualify a claim under the 'arising out of employment' requirement if the employment aggravated, accelerated, or combined with the disease or infirmity to produce the death or disability for which compensation is sought.'' Larson's Workmen's Compensation Law, Vol. 1, Sec. 12.20, p. 170. The quoted text is supported by decisions from the courts of forty-one of the forty-eight states. We may not follow to its limit the statement, sometimes expressed, that the employer takes the employee as he finds him. It is unnecessary for us to so generalize, since, while this view may be applicable in the instant case, it may inject difficulty in cases where no trauma is present. It is stated in the same text that: ''A clear majority of jurisdictions now

hold that when usual exertion leads to something actually breaking, herniating, or letting go, with an obvious sudden mechanical or structural change in the body, the injury is accidental.'' Op. cit., supra, Sec. 38.20, p. 519. The same view is stated in 58 Am. Jur., Workmen's Compensation, Sec. 255: ''By the weight of authority, the sudden and unexpected breaking of some portion of the internal structure of the body, as in the case of cerebral hemorrhage, apoplexy, hernia, etc., or the failure of some essential function thereof, as in the case of heart failure, paralysis, and similar afflictions, brought about by the exertions of the employee while engaged in the performance of his duties, or by the conditions of the employment, even without any external happening of an accidental nature, is to be regarded as an accidental injury within the meaning of the terms 'injury by accident,' . . .'' Such view is consistent with Thornton v. Magnolia Textiles, 55 So. 2d 172 (Miss.) where the causal relation of a fall to the aggravation of a pre-existing disease was allowed to remain a factual issue. So also in Fischer v. Gloster Lbr. & Builders Supply Co., 57 So. 2d 871 (Miss.) We hold, therefore, that the disability was caused by an accidental injury and is compensable.

We next encounter the contention that the appellee is barred of recovery by a failure to give timely notice of his claim. Reference is made to Section 12 (a) of the Act, which is as follows: ''No claim for compensation shall be maintained unless, within thirty (30) days after the occurrence of the injury actual notice was received by the employer or by an officer, manager or designated representative of an employer. If no representative has been designated by posters placed in one or more conspicuous places, then notice received by any superior shall be sufficient. Absence of notice shall not bar recovery if it is found that the employer had knowledge of the injury and was not prejudiced by the employee's failure to give notice.''

We return to the record for a disclosure of the data here relevant. The first symptom of pain occurred on April 24th. The following day, Dr. Benson, to whom a history of the case had been given, did not diagnose either the exact cause or effect. He stated that "the job is causing it." As to what was causing what is not disclosed. Appellee was evidently not aware of any facts making more definite the general statement of the doctor, since appellee returned to work that same evening, and again on the 27th on which day he reported to the foreman, Ware, that "My legs have played out . . . and that I wanted to try to go to the doctor." Ware gave him the written slip mentioned above describing his condition merely as "sick." The slip was not to authorize him to seek the aid of the appellants' physician but merely "to get out the gate." There is no testimony covering the following period that appellant ever knew either what his trouble was or what had caused it. We are constrained to deny efficacy to the statement of Dr. Benson that "the job was causing it." There was, as previously stated, no examination to reveal what could be termed an accidental injury. The statement, which drew upon appellee's recitals, for diagnostic aids, was not that a definite injury had caused a known result, but only that in some way the work was causing the symptoms then present which consisted in a partial paralysis. Indeed, it was the very uncertainty which led Dr. Benson to refer him to Dr. Patton in Mobile for diagnosis. X-rays taken by Dr. Benson revealed no broken bone or other lesion although the doctor suspected some lesion in the spinal cord.

As stated, appellee underwent his first operation under Dr. Patton on May 2nd, and the second the following day. On the latter date, Dr. Benson was not present. Early in June, Bates, the appellant's general foreman, visited appellee and carried to him a donation contributed by his fellow workers. The physical condition of appellee was discussed, and according to Bates: Q. "You

know when he came to work?" A. "The last time he worked there, Mr. Byrd, we hired him on the 19th of April, this year." Q. "Do you know how long he worked there?" A. "His last time?" Q. "Yes, sir." A. "Yes, he worked about a week." Q. "You know why he left employment at the time that he did?" A. "When he went out of the yard?" Q. "When he went out." A. "My night foreman gave him a pass. He was sick." Q. "Did Mr. Byrd see you and discuss anything with you before he left?" A. "No, sir." Q. "I will ask you what next did you learn with reference to Mr. Byrd's condition after he left sick?" A. "On a Monday following this Friday night that he went out sick Mr. Ivy came over and told me that Mr. Byrd was in the hospital paralyzed." Q. "I ask you what transpired next as far as your relations with Mr. Byrd are concerned?" A. "Well, it was some weeks after that I went and visited Mr. Byrd. The employees there in the department, they taken up a collection of money, and I took it, my wife and I took it up to Mr. Byrd on a Saturday evening late." Q. "You know what day that was?" A. "No, it was some time—it was some time in the first part of June. It was on a Saturday." Q. "What did Mr. Byrd tell you with reference to his condition when you arrived there at Lucedale?" A. "Well, Mr. Byrd told me after we had been there, just a general visit, he told me that the doctor that operated on him in Mobile—I have forgotten the doctor's name—he said that the type of work that he was doing had caused it. I had asked him about the operation. He told me about the incision they made in his back, how much it was. I asked him what caused it. He said the doctor that had operated told him it was the type work he did."

So that the company through Bates knew all that appellee knew. If such disclosures revealed the exact cause and effect, the company had knowledge of it; if it did not, it follows that appellee himself had not been fully appraised.

On April 28th, appellee undertook, through his brother, to notify Bates that the job "caused it." This message was referred to one Ivy, who transmitted to Bates only the information that appellee was paralyzed and in the hospital. So far as the record shows, the first information that the nature and manner of the work had caused the paralysis is found in a letter from Dr. Patton to appellee's counsel so advising. This letter was dated July 18th. On July 23rd, Dr. Benson wrote a full report to the appellant insurance carrier to like effect. On August 8th, a letter and report of like effect was written by Dr. Suraci to counsel for appellant. The original claim for compensation was filed on June 25, 1951. The appellants were notified of the claim through a letter from counsel for appellee dated June 25th. On June 27th, two days after the claim was filed, the Commission wrote to appellee's counsel suggesting that a report be made to appellants. Such notice was sent to the carrier under date of June 29th, and a formal report was made on July 13th by Dr. Benson.

It is seen that the first disclosure of the cause and effect of the injury is found in the letters and report of Dr. Benson on July 13th and from Dr. Patton dated July 18th. The several doctors were subpoenaed before the Commission and the hearing was held and the finding of the attorney-referee is dated August 18th.

Now, the language of the Act (Sec. 12a), quoted above, must be held to define "notice of the injury" as the transmittal by the employee of knowledge possessed by him. Unless he has notice, he can not give notice. In this connection, it may be sufficient to suggest, for illustration, situations where a cause, such as the inhaling of noxious dust or fumes, matures into a well-defined disease after the lapse of several weeks or months.

So that, we repeat, whatever appellee knew from the outset up to the time of Dr. Benson's and Dr. Patton's reports, the company knew. Such information was only that appellee was sick and paralyzed. There is no com-

plaint that the hearing was had too early but that the notice was given too late.

Again, we find it convenient to summarize our views by quoting from recognized authority: **(Hn 3)** "Failure to make claim upon an employer for compensation within the prescribed period is not a defense if the accidental injury is latent and progressive and cannot with reasonable certainty be recognized at first as compensable. In such case, however, claim must be made within the statutory period from the time the employee acquires knowledge of a compensable disability as a result of the accident." 58 Am. Jur., Workmen's Compensation, Sec. 382, p. 831. This view is further supported by a recent text documented with numerous cases: "Except under statutes expressly dating the limitations period from the 'accident', the time for notice or claim does not begin to run until the claimant, as a reasonable man, should recognize the nature, seriousness and probable compensable character of his injury or disease. . . . Yet the great majority of the courts have been sufficiently impressed with the acute unfairness of a literal application of this language to read in an implied condition suspending the running of the statute until by reasonable care and diligence it is discoverable and apparent that a compensable injury has been sustained." Larson's Workmen's Compensation Law, Sec. 78.41, pgs. 260-261. It is our conclusion that the finding of the Commission, affirmed by the circuit court, that the employer had knowledge of the injury and was not prejudiced by the employee's failure to give earlier notice, is justified.

The final contention is made that an award of paid and accrued medical and hospital bills was improperly made. The applicable statute is Sec. 7, Chap. 412, Laws of 1950: "The employer shall furnish such medical, surgical and other attendance or treatment, nurse and hospital service, medicine, crutches, artificial members and other apparatus, for such period as the nature of the injury or the process of recovery may require. If the

employer fails to provide the same, after request by the injured employee, such injured employee may do so at the expense of the employer. The employee shall not be entitled to recover any amount expended by him for such treatment or services except in emergency cases, unless he shall have requested the employer to furnish the same and the employer shall have refused or neglected to do so, or unless the nature of the injury required such treatment and services and the employer or his superintendent or foreman having knowledge of such injury shall have neglected to provide the same; . . .''

We find in the record no request by appellee for medical or hospital service. When first dismissed from work on April 27th, he was accosted by the guard at the gate who learned that appellee was ''sick.'' The appellee thus relates this incident as follows: ''I got out to the guard gate and he tried to find a doctor for me. And so I told him let it go, might be my best chance would be at the hospital, so I went to Jackson County Hospital and told the nurse there at the desk what I wanted . . .''

(Hn 4) Let it be said that appellee did not appreciate the nature and seriousness of his injury, so neither did the company. He chose his own course, and sought hospitals and doctors of his own choosing. No request was made of the company to furnish such services. Even a liberal construction of the statute can not amend it by judicial legislation. His very ignorance of the compensability of his injury has been availed of to justify an award for compensation. We must follow a consistent course by disallowing the award for medical and doctor's bills, since, regardless of the reason therefor, he failed to avail of the offer of the company, informal though it was, and sought out his own sources of aid. Nor do we think there was an emergency sufficient to excuse compliance with the statute. His trip to Mobile for examination was impelled not by certainty but by uncertainty. An emergency must allow of no reasonable alternative consistent with

the preservation of life or irreparable injury from delay. On the dates when he was taken to the George County Hospital or to Mobile, he could, had he elected to do so, have requested that these services be furnished by the appellant. A denial of this award, however harsh it may be construed by an employee, points up the purpose of the Act to grant compensation under liberal interpretation, but at the same time to require, in the interest of the carrier and the employer, compliance with prerequisite conditions. We are constrained, therefore, to amend the award, by eliminating the items of medical and hospital bills. Fischer v. Gloster Lbr. & Builders Supply Co., supra.

This disposes of the contention that the allowance of twenty-five percent of the total award as attorneys' fees should be based upon the total of the compensation award and of these bills.

As above stated, the employee has died pendente lite. The award was not in a lump sum but on the maximum weekly allowance not to exceed a total of $8,600.

The cause is therefore affirmed as to the liability of the appellants as to compensation and disallowed as to the award of medical and hospital expenses, but will be remanded for such adjustment as may be found appropriate in view of appellee's subsequent death. Costs will be taxed against the appellants.

Affirmed in part and remanded.

*Roberds, P. J.* and *Hall, Kyle* and *Holmes, JJ.,* concur.