KING *v.* WESTINGHOUSE ELECTRIC CORP., et al.

No. 40311 January 21, 1957 92 So. 2d 209

*Frank E. Shanahan, Jr.,* Vicksburg, for appellant.

*Dent, Ward & Martin,* Vicksburg, for appellees.

HALL, J.

This is a workmen's compensation case. The appellant was employed by Westinghouse at its plant in Vicksburg, Mississippi, from June 8, 1953 to August 30, 1955, with the exception of a brief period of time in April 1954 when she obtained sick leave from her work and had an operation for the removal of an abscessed ovary. One of the doctors participating in this operation testified that she was back at work and in apparently good condition within a period of about four to six weeks. The other doctor participating in the operation testified that it usually takes sixty to ninety days for a complete recovery. At any rate appellant returned to her work and continued in the employment of Westinghouse until August 30, 1955. On that date she was required to operate a press which is apparently a large and heavy machine into which were fed steel sheets approximately 10½ feet in length, 9½ inches in width, and 3/32nds of an inch in thickness, and weighing approximately 28 pounds. These large sheets were cut by the press into 47 small pieces which were used as braces or brackets in connection with the manufacture of some kind of product.

A supply of these steel sheets was placed on a skid which was elevated a distance of about 6 inches from the floor. Five presses were in operation and it was the duty of a helper to obtain these loaded skids from a warehouse or storage place and transport them to the presses by means of a portable piece of machinery. In doing this work to keep the presses supplied most of the time of the helper was spent in getting materials and transporting them to the presses.

Appellant was required to pick up these large sheets of metal and place them on a kind of table which formed

a part of the press. Appellant is a very small woman and it was necessary for her to lift these steel sheets to approximately the height of her shoulders. On August 30, 1955, while doing this work of lifting these steel sheets onto the high table arrangement, the appellant felt something give in her stomach which she said burned like fire. She made complaint immediately to a nurse on duty in the plant who instructed her to go to see Dr. L. J. Clark for attention. Before going to the doctor she reported her condition to the general foreman in the feeder section and tool department of Westinghouse and also a representative of the union contacted this general foreman who went over the job classification with the union business agent and reported that notwithstanding the heavy work, appellant was due to do the work without assistance. Appellant also reported the matter to the supervisor of industrial relations with Westinghouse who told her that if he had as many complaints as she had he would quit the job if he were she.

Appellant reported to Dr. Clark who examined her on August 31st and found tenderness in the lower left portion of her abdomen and found that she had fever and that her blood count was elevated. He described it as an inflammatory condition. He called in Dr. J. A. K. Birchett on the case who assisted in the treatment. Both of these doctors testified at the hearing and both testified positively that the appellant could not do any work in the future which required lifting. Prior to the hearing these two doctors signed a joint statement describing in detail their findings. In this statement they said that appellant was advised to go home and go to bed and they gave her treatment for trauma and soreness and activation of the trouble in the pelvis, but that on the following day, September 1st, her condition became so much worse that she was forced to come to the hospital for treatment. In this statement they both said that her trouble was unquestionably due to a tearing loose of

ligaments and adhesions from the previous operation in April 1954. They made a diagnosis of acute peritoneal irritation and advised her to stay in bed and take the necessary treatment to overcome this soreness. She remained in the hospital about eight days and was then allowed to go home and the statement says that she has been observed in the clinic at intervals since then and has apparently shown satisfactory progress, "but is not, by any means, able to return to this heavy type of work that she had been doing previous to entering the hospital". The statement further says that she is able to do a secretarial job but that unquestionably the injuries "were the result of the class of work that she was doing while working at the Westinghouse Electric Corporation". This statement is dated October 21, 1955.

Dr. Clark testified that after the operation in April 1954 appellant returned to her work and that her condition at that time was "apparently all right". He also said that he did not remember any aftereffects that appellant incurred as a result of the April 1954 operation. He further said that Dr. Birchett made a pelvic examination of appellant and that he, Dr. Clark, did not feel qualified to give an opinion as to her present condition, and that Dr. Birchett would be in a better position to do so. The doctor confirmed the writing of the aforesaid letter of October 21st.

Dr. Birchett testified that his specialty is gynecology or female surgery and obstetrics. He said that after the operation in 1954 the appellant "made a pretty good recovery". He said that he was called in by Dr. Clark on August 31, 1955, and he found the patient not only complaining of considerable pain, but she apparently was in pain. Upon examination he concluded that she had adhesions as a result of the operation and "the act of strain or picking up had caused a tearing of these adhesions and in my opinion that was the cause of the disability and her complaint". He stated that the tearing

was of a relatively recent nature. He explained the treatment given to her in the hospital in September 1955, and in answer to the question "How did she appear to respond to the treatment", he said "Well, her inflammation subsided". He was asked whether she had reached a period of maximum improvement and his reply was "I didn't find at this time (November 18, 1955) any residual reaction". Immediately he was asked whether or not she was at this time qualified physically to do the heavy industrial type work she was doing at the time she was injured. And he replied "Well, my advice to Mrs. King was to get some kind of industrial work which would not entail too much physical or manual exertion. * * * Well from the history she gave that she picked up something that weighed twenty-five to twenty-eight pounds, I assumed it wouldn't be wise for her to go back to that type of work and that was my recommendation to her. I cautioned her about working around home. I said, 'Don't get home and work in the garden and pull up this and do heavy work around home.' I don't feel she should have any strenuous exertion for some period of time." He was then asked "What period", and he said "She is probably as well today as she will ever be, which I consider satisfactory." He further said that she should refrain from anything that would entail a lot of lifting or pulling and that it was his opinion that there was a causal connection between the strain she was engaged in and the tearing which he found at the time of the first examination. On cross examination he repeated that he found no residuals from the injury which she received on August 30th but he immediately repeated that he advised Mrs. King against doing any type work that would require lifting, not only in her employment, but around home. He was also asked if he didn't advise her against doing heavy lifting after the operation in April 1954 and he replied "for only a limited time". He further said that if she had a type of work at

the Westinghouse plant which would not require lifting, she would be physically able to do it "provided it is not a type of work which would entail pulling on the abdominal muscles".

Upon examination by the attorney-referee Dr. Birchett said that the 1955 accident was in association with the operation and the exertion caused the breaking of these adhesions, and that her disability was caused by a combination of the aftermath of her operation and the accident.

The supervisor of industrial relations for Westinghouse testified, as above stated, that he told Mrs. King "if I had as many complaints as she had, I would quit, if I were her", and that she left her badge with him and asked if she could keep the appointment which the nurse had made with the doctor and he told her to do so. He was asked on cross examination whether he had a job at Westinghouse that is available for Mrs. King that she would be able to do, and his reply was "when an employee quits we don't just make a job for them. Some of them we reemploy". He also said that they have some jobs that are light work but he did not say that any such job was available to the appellant.

The attorney-referee made the following findings of fact: "1. On August 8, 1955, claimant, Mrs. Hilda King, was an employee of defendant Westinghouse Electric Corporation in Warren County, Mississippi, at an average weekly wage of $42.53. 2. That on said date claimant sustained a compensable injury within the scope and course of her employment and that as a result thereof was temporarily and totally disabled from the date of said injury until September 15, 1955. 3. That there is no residual of said injury nor is there any permanent partial disability to claimant as a result of said injury." The attorney-referee therefore awarded the claimant $25.00 per week for a period of two weeks.

It will be noted that the attorney-referee in his findings gave the wrong date of the injury, which should have been August 30 instead of August 8, and that he also found that there is no residual of said injury and no permanent partial disability.

On appeal by the claimant from his decision, it was affirmed by the full commission and by the circuit court.

Mr. John Scott, the owner of United Electric Company, which company is engaged in general contract and repair work, testified that the claimant now is doing secretarial work for him and has been since about the middle of September 1955 at a salary of $40.00 per week, and that her duties consist only of answering the telephone, making out the payroll and making out invoices for the jobs and getting out the bills. He further testified that he does not consider her employment permanent and that if his work gets slack he couldn't afford to pay her for full time but would have to cut her to a part time job.

In National Surety Co. v. Kemp, 217 Miss. 537, 64 So. 2d 723, we said: "We have consistently held that the Workmen's Compensation law should be given a broad and liberal construction and that doubtful cases should be resolved in favor of compensation." A number of cases are then cited to sustain this proposition.

In Ingalls Shipbuilding Corp. v. Byrd, 215 Miss. 234, 60 So. 2d 645, we held that "Pre-existing disease or infirmity of the employee does not disqualify a claim under the 'arising out of employment' requirement if the employment aggravated, accelerated, or combined with the disease or infirmity to produce the death or disability for which compensation is sought." The same thing was held in East v. Pigford Bros. Construction Co., 219 Miss. 121, 68 So. 2d 294, and in not less than a dozen other cases which have been decided by this Court. The principle is so firmly established in the juris-

prudence of this State that it is not subject to serious question.

There is no substantial dispute as to the facts disclosed by the record in this case. It shows beyond question that the claimant's condition was aggravated by the strain which the work required of her. In fact the attorney-referee so found in this case, but he seems to have gone off on the theory that the claimant was entitled to only two weeks compensation because she had obtained other employment which was paying her $40.00 a week, a slight reduction under what she was being paid at the time of the injury. ██ █ The attorney-referee and the commission and the circuit court entirely overlooked the provisions of our Workmen's Compensation statute as construed by three decisions of this Court. In the case of Karr v. Armstrong Tire & Rubber Co., 216 Miss. 132, 61 So. 2d 789, we quoted from Larson and pointed out that the degree of disability is calculated by comparing *actual earnings* before the injury with *earning capacity* after the injury. To the same effect is Elliott v. The Ross Carrier Co., 220 Miss. 86, 70 So. 2d 75, and Ebasco Services, Inc., et al v. Harris, 85 So. 2d 784, not yet reported in the State Reports.

██ █ It is our opinion that the fact that the claimant was able to obtain light work in a temporary position which paid her $40.00 per week is not conclusive that her earning capacity is $40.00 per week.

██ █ Section 6998-09 of the Code of 1942 provides for compensation for permanent total disability, then for temporary total disability, and then for permanent partial disability. The latter is defined as a disability which is partial in character and permanent in quality. The attorney-referee in his examination of claimant's doctor said: "I can appreciate the fact that this is a difficult question to answer. Nevertheless I think it is pertinent. Do you consider that Mrs. King has any permanent physical disability at the present time as a result of the

aggravation of her conditon by this accident?'' The doctor replied with a question as follows: ''What do you mean by the word 'permanent'? Do you mean as long as she will live she will have a permanent disability?'' The attorney-referee replied ''Yes'', and the doctor said ''I do not think so.'' It will be borne in mind that, as hereinabove stated, his advice to claimant was to get some type of industrial work which would not entail too much physical or manual exertion, and he further said that he assumed it would not be wise for her to go back to that type of work and that was his recommendation to her. Fairly construed, the doctor's testimony was that it would be dangerous for the claimant to again engage in the type of work which she was doing when injured.

As we have pointed out already, the compensation act should be given a broad and liberal construction and that doubtful cases should be resolved in favor of compensation. Almost the same rule prevails in this State with reference to insurance policies. In the case of Equitable Life Assurance Society v. Serio, 155 Miss. 515, 124 So. 485, this Court had occasion to deal with the meaning of the word ''permanent'' in a life insurance policy which insured against total and permanent disability, and in that case this Court said:

''It is the further main argument that the proof does not show that the disability was and is a permanent one. In other words, as we understand the import of the argument, the contention is that it is not shown that the insured may not get well. * * *

■■ ■ ''We construe the term *permanent,* when used in a policy provision such as this, as one used for the proper purpose, and for the purpose only, of excluding disabilities which are merely *temporary.* Although the disability be one which may or will pass away in a fair period of time, yet if the required period is longer than that which, reasonably considered, is only temporary,

then it must of necessity fall within the opposite general term permanent, because it is not temporary. █ There are many cases and situations in the law, and these outside of insurance problems, where the word *permanent* is used and interpreted in a time sense far shorter than perpetual or lasting always. The connection in which the word is used, rather than its most restricted literal definition, is required to control.''

The attorney-referee advised the doctor that the compensation statute means that ''permanent'' signifies as long as the claimant will live. In this we think he was in error and that the commission and the circuit court were likewise in error in adopting the attorney-referee's idea as to the meaning of the statute, and that we should construe the word exactly as it was construed in the Serio case.

 █ The record is without dispute that claimant is not and will not be able to do the work which she formerly did, and it is our opinion that under the undisputed facts in this case the claimant was entitled to recover more than two weeks compensation, and was entitled to recover for a permanent partial disability. How much she was entitled to recover we are unable to determine from the record before us, but in view of our conclusions the judgment of the attorney-referee, the commission and the circuit court are in error and must be reversed and the cause remanded to the circuit court and then to the commission for an adjudication on this matter.

Reversed and remanded.

All Justices concur except *Kyle* and *Gillespie*, JJ., who dissent.

GILLESPIE, J., dissenting.

I respectfully dissent.

The precise and fundamental question in this case is one of fact. It is: Had Mrs. King recovered from the injury received by her on August 30, 1955? This ques-

tion was resolved against Mrs. King by the attorney-referee and the commission. There was ample evidence to sustain this finding. We are confronted with the often quoted rule that where the commission makes a finding of fact which is supported by substantial evidence this Court will not reverse such finding.

Mrs. King was an employee of appellee, Westinghouse Electric Corporation, on April 2, 1954, when she entered the hospital suffering with "inflammation of the pelvic female structures." On April 14 she underwent an operation for the removal "of a large abscess which had developed in one of the ovarian structures. There was evidence of peritenonitis." She was discharged on April 23, 1954. An examination on May 4 was made by her physician and he told her to return to work "if she felt like it." She worked until August 30, 1955, on which date her work required that she lift sheets of metal that weighed about 28 pounds. According to her own statement, "that is the first time they had ever put me on that particular job before." She said she had never operated with that material before. On that day, August 30, 1955, Mrs. King felt a burning sensation in her stomach and quit work. She was hospitalized the next day and was discharged September 3, 1955. About September 15, 1955, she started working as a secretary making $40 per week. The commission held her average wage at Westinghouse was $42.53 per week. It appears that she had not worked regularly the past year, for the payroll record showed that her actual paid wages for the previous year with Westinghouse averaged $30.78 per week.

The attorney-referee and the commission found that Mrs. King sustained a compensable injury and was disabled for two weeks. There is no contention made that she did not sustain a compensable injury on August 30, 1955, that disabled her for two weeks, and statements made by her physicians to the effect that such disability was due to her work aggravating her preexisting pelvic

condition should not be taken as meaning that the doctors were of the opinion that her disability thereafter to return to a job requiring heavy lifting was the result of the injury. With reference to the quotation in the majority opinion from the letter signed by Drs. Clark and Birchett that the injuries "were the result of the class of work she was doing while working at the Westing house Electric Corporation" clearly and definitely referred to the injuries found by these doctors following the lifting of the material on August 30, 1955. But that statement has no bearing on the question whether subsequent examinations showed that Mrs. King had recovered from the injuries sustained on August 30. In the letter referred to, the doctors were referring to the original compensable injury of August 30, 1955. The crucial question here involved—whether there were any residuals from that injury—was not mentioned in the statement, directly or by inference. This is not only manifest from a reading of the letter, but in November following when the hearing was held, Dr. Clark, who dictated the letter and signed it with Dr. Birchett, testified that he had examined Mrs. King on several occasions after she left the hospital in September, and he was asked this question: "Do you feel qualified then to have an opinion as to her present condition?" His answer was "No, sir." Dr. Clark testified that Dr. Birchett made the last examination, that Dr. Birchett would be in a better position to pass on whether Mrs. King had recovered from the injury. Dr. Clark would not say one way or the other as to whether Mrs. King was in as good a condition as she was after the operation (in 1954), but he did testify that from what he knew about the situation, Mrs. King could return to work that did not require lifting. (The injury on August 30 was the pulling loose of adhesions left from her female operation, and the lifting that resulted in the injury had never been required of her prior to August 30).

Thus we put aside the statement of the doctors contained in the letter that appears on the file, for the reason above stated. Although the clear inference justifiably to be drawn from Dr. Clark's testimony is that Mrs. King was able to return to her regular work at Westinghouse, that is, the job she had done before August 30, the date of her injury, which did not require the lifting that resulted in her injury, nevertheless, we will say for the purpose of this discussion that the testimony of Dr. Clark is laid aside. Certainly, it cannot be said to be favorable to Mrs. King, for he stated in plain words he did not have an opinion as to her present (November 1955) condition.

Making these concessions to Mrs. King's position, there is nothing left upon which to base an award for permanent disability except the testimony of Dr. Birchett, a gynecologist, who operated on Mrs. King in 1954 and who treated her after her injury on August 30, 1955, and examined her as late as November 18, 1955, prior to the hearing on November 22, 1955.

Dr. Birchett, after an examination to determine the cause of pain following her injury on August 30, 1955, was of the opinion that there were adhesions following the 1954 operation, and that these adhesions had been torn from the strain of lifting. Of course, as already stated, the resulting disability was caused by aggravation of a preexisting weakness or condition and was clearly compensable. The commission properly so held. She was discharged on September 8, 1955, and Dr. Birchett said "her inflammation had subsided." Dr. Birchett again saw Mrs. King on November 18, 1955, and examined her and of her condition at that time he said, "I didn't find at that time any residual reaction." Dr. Birchett was asked if Mrs. King could do heavy industrial work, and he answered, "Well, from the history she gave me that she picked up something that weighed twenty-five to twenty-eight pounds, I assumed it wouldn't

be wise for her to go back to that type of work and that was my recommendation to her." Further, Dr. Birchett said, "She is probably as well today as she will ever be, which I consider satisfactory," and, "I don't see why she couldn't stand on her feet all day long. But she couldn't do anything that would require an undue strain on her stomach." Dr. Birchett again, in reference to whether she had recovered from the strain of August 30, stated:

"Q. As I understand your testimony with reference to that was that you did not find any evidences and there was no residuals from this injury which she received on August 30?

"A. That is correct."

I do not know how the doctor could have said in plainer words that Mrs. King did not have any disability from the strain of August 30.

Then Dr. Birchett continued to explain why he advised against Mrs. King doing heavy lifting, and said: "If she would indulge in any heavy lifting, she might have a recurrence." A recurrence of what? It could not have meant but one thing—that those adhesions left from her operation in 1954 might be torn again. This is made crystal clear by the next question to Dr. Birchett and his answer.

"Q. She has a condition as a result of this operation that you think she should favor?

"A. That is right."

The only statement made by Dr. Birchett that would be favorable to Mrs. King on the crucial issue was his answer to certain questions put by the attorney-referee as follows:

"Q. Am I correct that in your opinion any disability Mrs. King may have at this time is caused by a combination of the accident superimposed upon the operation?

"A. You mean the aftermath of her operation and the accident—

"Q. Have combined?

"A. They are."

But the triers of fact should not be told by this Court to take this one statement out of the whole context and find claimant permanently disabled. The doctors probably understood that the disability referred to was that following the injury on August 30. This is especially likely since he had so clearly stated that there were no residuals from the strain of August 30. He later testified that he did not think Mrs. King had any permanent disability in the sense of permanent being as long as she lived. But he said she had recovered, and further said her condition was very satisfactory on November 18, 1955.

It is my considered opinion that for the triers of fact to find any permanent disability they would have to ignore the overall effect of the medical testimony and place a finding on one isolated statement.

On this evidence the triers of fact found a compensable injury and awarded temporary total disability for two weeks. It specifically found that there was no residual of the injury of August 30 and no permanent partial disability as a result of the said injury.

I do not understand how it can be said that the attorney-referee, the commission and the circuit court went off on the theory that because Mrs. King went to work for another employer two weeks after her injury she was not entitled to permanent disability benefits. It certainly cannot be because this fact was mentioned. It was a circumstance to be considered, although not conclusive. But it seems clear what the order denying permanent disability was based on. It was based on the finding of fact that Mrs. King had no residual from the August 30 injury, words taken out of the mouth of her own physician and witness.

Emphasis seems to be placed on the fact that Mrs. King's physicians advised her not to go back to the work she was doing when she strained herself lifting. Now, let us look at that proposition. She had the 1954 operation that left her with a weakness from adhesions. She went back to work and worked over a year. The first time she tried a job that required her to lift 28 pound sheets of metal she tore the adhesions. She was hospitalized a week, went to work for another employer in two weeks, and from the last examination before the hearing, the physician said he found no residual from the August 30 injury. But he advised her not to return to the lifting work that she was doing when she strained the adhesions. He did not tell her she could not go back to the work she had been doing from the time of her recovery from the operation in 1954 until she tried to lift the heavy material on August 30, 1955. She could work all day if she did no lifting. In other words, Mrs. King tried a new job, by her own statement, on August 30. The strain of that aggravated the condition left from her operation. She recovered from the results of that aggravation. Now it cannot be the law that she can recover permanent disability benefits because her doctor advised her not to go back to the job she tried on August 30 because to do so might again aggravate her adhesions.

The legislature of the State of Mississippi vested in the Workmen's Compensation Commission the job of administering the act so long as it stays within the act and the law as laid down by this Court. I think the majority have not given consideration in this case to the rule that where the finding of the commission is based on substantial evidence, it is conclusive on appeal.

*Kyle, J.,* joins in this dissent.

## ON MOTION FOR ALLOWANCE OF ATTORNEY'S FEES

HALL, J.

In our decision of this case on January 21, 1957, we held that the appellant was entitled to recover compensation, and that the same should be the difference between her actual earnings before the injury and her earning capacity after the injury; we further said that we are unable to determine from the record before us how much weekly compensation she was entitled to recover and the judgment of the attorney-referee and the Commission and the circuit court were reversed and the cause remanded to the circuit court and then to the commission for an adjudication on this matter.

The attorney for appellant has filed a motion for the allowance of attorney's fees, but in the motion he requests that we determine whether or not the minimum compensation benefits of $10.00 per week is applicable.

Counsel for the appellees have filed an answer to the motion and they agree that they have no objection to the allowance of attorney's fees but they do object to a determination at this stage of the proceeding as to whether appellant's future compensation shall be at the rate of $10.00 per week. In the original opinion which is reported in 92 So. 2d 209, not yet reported in the State Reports, we pointed out that we were unable to determine from the record the amount to which the appellant is entitled and we decline to do so at this time. However, the motion will be sustained to the extent that the attorney for appellant will be allowed a fee of 33 1/3 percent of the benefits which may be awarded to appellant, this being in accordance with the written contract between the appellant and her attorney, which contract is filed as an exhibit to the motion.

Motion sustained in part.

*McGehee, C. J.,* and *Lee, Kyle* and *Holmes,* JJ., concur.