ALEXANDER SMITH, INC., et al. *v.* GENETTE

No. 40553        November 25, 1957        98 So. 2d 455

*Vardaman S. Dunn,* Jackson, for appellant.

*Pyles & Tucker,* Jackson, *Willard L. McIlwain,* Green-
ville, for appellee.

170

**KYLE, J.**

This case is before us on appeal by Alexander Smith, Incorporated, and its insurance carrier from a judgment of the Circuit Court of Washington County affirming an order of the Mississippi Workmen's Compensation Commission awarding compensation to Lois W. Genette, an employee of the appellant corporation, for an accidental injury arising out of and in the course of his employment.

The record shows that the appellee, Lois W. Genette, was employed by the appellant corporation on January 17, 1953, as a night watchman for the Greenville Mills plant at Greenville, Mississippi. He was 52 years of age at that time. He had suffered from hypertension for a period of several years, but was given a physical examination prior to his employment and was passed for work as a night watchman. He worked regularly for the appellant corporation from the date of his employment until November 15, 1953, when he fell on a ramp at the northeast corner of the main building of the plant while making his rounds as night watchman, and was carried to the

hospital where he was examined and was found to be suffering from a cerebral hemorrhage or what is commonly known as apoplexy, and he was never able to work thereafter.

The appellee filed his claim for compensation on November 8, 1955, and a hearing was had on the claim on March 13, 1956. At the conclusion of the evidence the attorney-referee found that Genette had sustained an accidental injury on November 15, 1953, which arose out of and in the course of his employment. The attorney-referee found that his average weekly wage exceeded $37.50, and the attorney-referee ordered that the employer and its insurance carrier pay to the claimant compensation for temporary total disability at the rate of $25 per week for the period from November 16, 1953, through December 10, 1953, and compensation at the rate of $25 per week for permanent total disability from and after December 19, 1953, but not to exceed 450 weeks or $8,600, whichever shall be lesser in amount, and that the employer and its insurance carrier pay all medical expenses incurred as a result of said injury. The commission affirmed the order of the attorney-referee, and the circuit court, as stated above, affirmed the order of the commission.

Two points are argued by the appellants' attorneys as ground for reversal of the judgment of the lower court: (1) That the claimant's evidence was insufficient to show that he fell on the ramp or platform as claimed; and (2) that the evidence failed to show a causal connection between the alleged fall or work incident, upon which the appellee relies to support his claim for disability compensation, and the appellee's admitted present disability. It is therefore necessary that we give a brief summary of the testimony.

Genette testified that, while he was making his rounds as night watchman, between 8 o'clock and 9 o'clock P. M. on November 15, 1953, he hung his foot on a piece of tin

lying on a ramp leading into the main building of the plant, and fell over the edge of the platform on to a concrete driveway running under the back part of the building, that he turned a somerset as he fell, and hit his head on the right side and his hip on the concrete 4 or 5 feet below. He crawled to the edge of the platform, got up on his feet and walked up the incline, however, and reentered the building through the back door and continued his rounds as a night watchman. At Station No. 7 there was an elevator, and as he went through a door he got his feet hung and fell to his knees near the elevator. He finally made his way to the weaving department, which was near the elevator, and told Willie King, a colored employee, about his fall. He made a telephone call to his wife. Mr. Beckum, his foreman, was notified and arrived at the plant a few minutes later. Genette stated that he told Mr. Beckum about his fall, but he did not tell him where he fell. Mr. Beckum carried him to the plant gate, and Mrs. Genette drove up in the family car, and she and his son, Merl, took him to the hospital, where he was examined and treated by Dr. A. L. Farr. He stated that he had a bruise on his hip about the size of a small orange, which he showed to Dr. Farr when he was examined at the hospital. He stated that there was also a bruised spot on the right side of his head back behind his ear. He remained in the hospital eight days, and stayed in bed a week after he went back to his home. His hip was still sore, his back hurt him and Dr. Farr sent him to Dr. Charles T. Berry, a bone specialist. Dr. Berry gave him some electric treatments and x-rayed his hip, but he was never able to work thereafter. He had another fall in September 1954 while he was in the bathroom at his home, and was carried to the hospital again and remained there about a month.

Genette stated that he had worked regularly before he had his fall on November 15, 1953. He had always done heavy manual labor. He stated that he had one nervous

spell in 1947, and went to Gamble's Hospital at that time for treatment, but he was in good health before his fall on November 15, 1953.

Mrs. Lois W. Genette, the wife of the claimant, testified that she received a telephone call from her husband about 9:30 P. M., on November 15, 1953, and that he asked her to come and get him and take him to the hospital. When she got to the mill Mr. Beckum and a colored man were there, and they helped in getting Mr. Genette into the car. She drove by her home to get their son Merl, and they carried Mr. Genette to the hospital. She stated that there was a knot on the right side of his head behind his ear, almost as large as an egg, and his hip was bruised. Merl Genette testified that he accompanied his father to the hospital, and he found out about his father's fall on the ramp the night that it happened. He heard his father say that Station No. 7 was the last station that he punched on the round that he was making when he fell, and he saw the black spot on his father's hip after his father left the hospital. He did not see the knot on his head, but he heard his father talking about it.

Harvey M. Beckum, maintenance foreman, and John W. Baskin, personnel manager, testified as witnesses for Alexander Smith, Incorporated. Beckum testified that Genette made his rounds as night watchman once every hour. There are 14 key stations that he was required to punch on each round, and it took 28 to 32 minutes to make a round. At the end of each round he returned to the gate and remained at the gate until time for his next round. Beckum stated that he received a telephone call from the mill about 9:20 P. M. the night Mr. Genette was carried to the hospital. He went to the mill immediately and found Mr. Genette sitting in a chair in the finishing mill office. He was perspiring profusely. Beckum offered to send him to the hospital, but Mr. Genette wanted his wife and son to take him. Beckum went to the gate with him and assisted in getting him into

Mrs. Genette's automobile. Beckum stated that he took charge of the time clock which Mr. Genette was using in making his rounds. Seven stations had been punched on the round beginning at 8:00 P. M. Station No. 7 had been punched about 8:25. He stated that he visited Mr. Genette one time while he was in the hospital. He asked Mr. Genette what had happened, and Mr. Genette told him that "he felt kinda dizzy and weak like," and thought that if he got a drink of water at the water fountain he would feel better, and the next thing he remembered was that he was in the elevator. Mr. Genette did not tell him at that time that he had fallen on the ramp when he entered the building. Beckum stated on cross-examination that, when he talked to Mr. Genette at the hospital, his words were weak and one could harly understand what he was saying. "He was what I would call a sick man."

John W. Baskin testified that he learned that Mr. Genette was in the hospital on Monday, and that he went to the hospital to see him the next day. Mr. Genette spoke mostly about an elevator that he got into before he made his way to the weaving room where he could call for help. Baskin stated that he went to Mr. Genette's home with a representative of the insurance company about a month after the accident, and Mr. Genette stated at that time that he had fallen on a ramp at the east end of the building. Baskin stated that the main building at the plant was about 100 feet long and 500 feet wide.

The three doctors were also called to testify as witnesses on behalf of the employer and its insurance carrier. Dr. A. L. Farr, who examined the claimant after he arrived at the hospital on the night of November 15, 1953, testified that the diagnosis made of him at that time was (1) cerebral thrombosis, left; (2) arteriosclerosis, general and cerebral; (3) hypertensive vascular disease, benign; (4) obesity, exogenous; and (5) duodenal ulcer, quiescent. He saw the patient again a few days later, and he was complaining of pain in his right hip, and there was a small

bruise on the right hip. He found no evidence of trauma to the head. Genette told him that he had hurt his knee, but he did not tell him that he had had a fall. One week after Genette was released from the hospital the doctor sent him to Dr. Charles T. Berry, because he was complaining at that time that he had fallen and had suffered an injury to the left knee. The doctor stated that it appeared from his record that Genette had had a ten-year period of hypertension, which meant elevated blood pressure. He was unable to say whether Genette was suffering from embolism, a hemorrhage or a thrombosis. He did not think that a fall 5 feet from the platform on to the concrete below could have produced a thrombosis. Trauma, however, can produce a hemorrhage in the brain. He was asked whether trauma could aggravate the condition of a man suffering from hypertension or arteriosclerosis. His answer was, "I don't think that just a fall would be apt to."

Dr. Charles T. Berry testified that he examined and treated Genette in December 1953. He saw him four or five times. He had examined him prior to the time he went to work for the Greenville Mills, and found at that time that he was suffering from highblood pressure; that he had suffered from hypertension for a number of years, but notwithstanding these ailments he passed him for a job as night watchman, which he considered a light job. He stated that, when he examined Genette in December 1953, Genette was suffering from pain in his right hip and right knee, and his mental condition was not as clear as it should have been. There was a definite weakness in his right arm and in his right leg, a mild form of hypertrophic arthritis. He was no longer fit for employment by the Greenville Mills. The patient told him that he had fallen and gave him the date, but he could not see any evidence of injury at that time. The main thing he noticed was the weakness of the right arm and the right leg and the change in his mental condition. He attributed that

to a cerebral vascular accident, ''I mean cerebral hemorrhage or what is commonly known as appolexy.'' He referred the patient to Dr. B. F. Hand who was a specialist in that line. On cross-examination Dr. Berry stated that he found that the motion of the patient's hip was somewhat limited and apparently painful, and it was entirely possible that a fall such as that described by the claimant's attorney would be sufficient to produce the pain and the limitation of motion referred to. From what he saw, it looked like Genette had had a mild case of appolexy or cerebral hemorrhage. He stated that trauma could aid in producing a cerebral hemorrhage, but ''I think more often than not, you have the cerebral hemorrhage without the trauma.'' He stated that trauma could aggravate most anything. Heavy work would aggravate hypertension, and trauma would aggravate hypertension. On cross-examination the doctor was asked whether it was his professional opinion that Genette suffered a thrombosis and fell, or that he fell and then suffered some sort of vascular injury or disease. His answer was, ''I don't think anyone can answer that question. I will admit, with all that falling and so forth, if he had had a slight hemorrhage, that certainly could have aggravated and made it bigger. Seems like it did come on slowly, because, as you say, he got up and continued his round * * * I don't believe that falling down caused the actual hemorrhage or produced the cause of whatever you want to call it.'' The doctor was then asked, ''Do you think it aggravated it?'' His answer was, ''I think it could very easily have aggravated something that was there.''

Dr. B. F. Hand testified that he examined Mr. Genette about December 10, 1953. He found that he had high blood pressure, and thought that he had probably sustained a cerebral accident, leaving him with some weakness of the right arm and leg. He was definitely a hypertensive patient. He ascribed his condition to ''a cerebral vascular accident.'' He said, ''I made no particular

effort to ascertain whether he had suffered trauma.'' The condition which he found might exist without reference to traumatic experience. The doctor stated that he examined Mr. Genette in September 1954, after his fall in the bathroom at his home. He found at that time that Genette had suffered a cerebral vascular hemorrhage, and was almost completely paralyzed on the right side.

■■ ■ We think there is no merit in the appellants' contention that the evidence was insufficient to show that the appellee fell as claimed on the ramp leading into the building. The claimant testified in detail concerning his fall on the ramp. Mrs. Genette and Merl testified concerning the bruises on his hip and the right side of his head, and both stated that the appellee tried to tell Dr. Farr about his fall when he got to the hospital, but Dr. Farr apparently failed to understand or paid little attention to the appellee's statement about the matter at that time. Dr. Farr, however, testified that the appellee had a small bruise on his hip when he sent him to Dr. Berry two or three weeks later. The testimony of the claimant was competent to prove his claim; and his testimony as to the facts concerning his fall on the ramp is uncontradicted, and is supported by the testimony of the other witnesses concerning the bruise on his hip and the knot on his head.

The main point argued by the appellants' attorneys, however, as ground for reversal of the judgment of the lower court is that the evidence failed to show a causal connection between the alleged fall or work incident upon which the appellee relies to support his claim, and the appellee's admitted present disability. The appellants cite in support of their contention on this point Ingalls Shipbuilding Corporation v. Howell, 221 Miss. 824, 74 So. 2d 863. But the facts disclosed by the record in the Howell case were entirely different from the facts disclosed by the record in this case.

In the Howell case the record showed that the claimant suffered a heart attack while he was using an oxyacetylene torch to apply heat to the bulkhead of a ship under construction, as he sat on a scaffold facing the bulkhead with his feet hanging down between the scaffold and the bulkhead. It was not shown that Howell had suffered any trauma, such as a fall from a ramp or a scaffold, and it was not shown that there had been any exertion or strain capable medically of causing Howell's collapse. Howell had not had any heart trouble to his knowledge prior to the date of the heart attack in question; and two heart specialists were of the opinion that Howell's heart attack was the result of a disease, and was not precipitated by the work that Howell was performing.

In the case that we have here the proof shows that Genette tripped and fell on a ramp while he was making his rounds as night watchman, and that he struck his head on the concrete and injured his hip; that he got back on his feet and continued his rounds until he passed Station No. 7, when he became confused and fell near an elevator; and that he finally made his way to the weaving department and called for help when he could go no farther. Dr. Farr, who examined Genette at the hospital, thought that he had suffered a cerebral thrombosis. Dr. Berry, who examined him about three weeks later, was of the opinion that he had suffered a cerebral hemorrhage. Both doctors testified that Genette had a pre-existing hypertension extending over a period of years. Dr. Berry testified that trauma would aggravate hypertension, and that trauma could aggravate or aid in producing cerebral hemorrhage.

There is also this circumstance in Genette's favor, which the triers of the facts had a right to consider, that Genette had worked for many years before as a watchman without incident, and while suffering from hypertension, had not been disabled thereby, until he sustained the

fall and the injury to his head and hip herein complained of, and within an hour after the fall Genette became totally disabled by what the doctors call a ''cerebral vascular accident,'' resulting in a partial paralysis of the left arm and leg. The time element alone strongly suggests some causal connection between the fall or trauma and the ''cerebral vascular accident'' which manifested itself so soon thereafter. Southern Stevedoring Co. v. Voris (C. C. A. 5th, 1955), 218 F. 2d 250; American Mutual Liability Ins. Co. v. King (1953), 88 Ga. App. 176, 76 S. E. 2d 81; McDonald v. Rader (1954), 177 Kan. 249, 277 P. 2d 652.

■■ This Court has held in many cases that, where the work of the employee aggravates a pre-existing disease or condition, the resulting injury is compensable. Ingalls Shipbuilding Corp. v. Byrd, 215 Miss. 234, 60 So. 2d 645; Cowart v. Pearl River Tung Co., 218 Miss. 472, 67 So. 2d 356; Pearson v. Dixie Electric Power Ass'n., 70 So. 2d 6, (Miss. 1954); W. G. Avery Body Co. v. Hall, 224 Miss. 51, 79 So. 2d 453; Southern Engineering Electric Co. v. Chester, 226 Miss. 136, 83 So. 2d 811, and cases cited. ■■ It is also well settled by our own decisions that the work of the employee need only be a contributing cause and not the sole cause of the injury in order that the injury may be deemed to arise out of and in the course of the employment. Cowart v. Pearl River Tung Co., supra; Pearson v. Dixie Electric Power Assn., supra; Tate v. Dr. Pepper Bottling Co., 220 Miss. 311, 70 So. 2d 602; Railway Express Agency v. Hollingsworth, 221 Miss. 688, 74 So. 2d 754; Sunnyland Contracting Co. v. Davis, 221 Miss. 744, 74 So. 2d 858; Thornbrough Well Servicing Co. v. Brown, 223 Miss. 322, 78 So. 2d 159; Mississippi Products Co. v. Gordy, 224 Miss. 690, 80 So. 2d 793; Prince v. Nicholson, 91 So. 2d 734 (Miss. 1957).

■■ We think that the evidence in this case was sufficient to support the findings of the attorney-referee and the commission that Genette was disabled by a cere-

bral vascular accident sustained as a result of, or accelerated and aggravated by, an accidental injury arising out of and in the course of his employment; and there was no error in the action of the circuit court in affirming the award of compensation benefits made to Genette by the attorney-referee and the commission. The judgment of the circuit court is therefore affirmed on the direct appeal of the employer and its insurance carrier.

The appellee has filed a cross-appeal, and in his cross-assignment of error says that the commission and the circuit court erred in failing to assess and order the appellants to pay the ten percent statutory penalty provided for in Section 6998-19(e), Mississippi Code of 1942.

The appellee has preserved his claim for the statutory penalty mentioned above at every stage of the proceeding; and we think that the commission and the circuit court erred in their failure to assess and direct the payment of the penalty. Section 6998-19(e) is as follows: "If any installment of compensation payable without an award is not paid within fourteen (14) days after it becomes due, as provided in subdivision (b) of this section, there shall be added to such unpaid installment an amount equal to ten per centum (10%) thereof, which shall be paid at the same time as, but in addition to, such installment, unless notice is filed under subdivision (d) of this section, or unless such nonpayment is excused by the commission after a showing by the employer that owing to conditions over which he had no control such installment could not be paid within the period prescribed for the payment."

It is admitted that no installments of compensation were ever paid to Genette prior to the award of compensation by the commission. There is no proof in the record to show that, owing to conditions over which the employer had no control, such installments could not have been paid within the period prescribed for the payment. The employer filed no notice with the commission stating that

the right to compensation was controverted until after Genette filed his formal claim for compensation on November 8, 1955.

In Southern Engineering & Electric Co. v. Chester, 84 So. 2d 535 (Miss. 1956), the Court said:

"Where the employer fails to controvert the right to compensation within fourteen days from the date of knowledge of injury or death, as provided in Code Section 6998-19(d), and later raises a defense or defenses when claim is subsequently filed, as authorized by the same sub-section, and the Commission makes an award of compensation, as it did in this case on August 10, 1954, the ten percent penalty under Code Section 6998-19(e) applies to those installments of compensation becoming due between the due date of the first installment (in this case fourteen days from the date of death) and the date the Commission makes the award of compensation."

The appellants in this case had notice of the appellee's injury from the time it happened, and the appellants had notice within a month thereafter that the appellee claimed that he had fallen on a ramp. The appellants completed their investigation of the claim by December 28, 1953, and advised the commission by letter that they were not in a position to give the case further attention. The appellants had determined not to pay. It would have been easy for the appellants to file a notice to controvert; yet they failed to do so. Under these circumstances the commission should have expressly adjudicated that the appellants were liable for the ten per cent penalty on all installments due and unpaid at the time the commission made its award.

The judgment of the circuit court is therefore affirmed on direct appeal, but reversed on the appellee's cross-appeal and the cause remanded to the commission with directions to assess and order the payment of the penalty provided for in Code Section 6998-19(e), supra.

The appellee is also entitled to a judgment for the five per cent damages provided for in Section 1971, Code of 1942, on the weekly installments which have already accrued and remain unpaid on the date of the entry of the judgment of affirmance, and also six per cent interest on such past due installments from the due date thereof.

The appellee's attorneys have included in their brief a motion for the allowance of an additional attorneys' fee for services rendered on this appeal. But there is included in the record a written agreement signed by the appellee and his attorneys where "it is agreed between the parties hereto that a fee of twenty five per cent will be paid to the party of the second part as attorneys' fees for services in this case. Said twenty five per cent is contingent on the amount of recovery, if any, that may be made." This agreement according to the appellee's brief was approved by the commission, and a fee of twenty five percent was awarded to the attorneys. The fee in this case was fixed by the parties and does not exceed the 33 1/3 per cent of the sum recovered, which has been fixed by this Court as a maximum to be allowed in cases of this kind. See Sunnyland Contracting Co., Inc., v. Davis, 221 Miss. 744, 74 So. 2d 858. This Court cannot make a new contract for the parties, or add to the terms of the contract which they have made. The motion for allowance of an additional attorneys' fee is therefore denied.

Affirmed on direct appeal; reversed on appellee's cross-appeal and remanded.

*Roberds, P. J.,* and *Arrington, Ethridge* and *Gillespie, JJ.,* concur.